AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | | |
|---|---|---|
| **LODGED**<br>CLERK, U.S. DISTRICT COURT<br>**06/02/2026**<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ DVE _____ DEPUTY | | **FILED**<br>June 2, 2026<br>CENTRAL DISTRICT OF CALIFORNIA<br>SOUTHERN DIVISION AT SANTA ANA<br>BY _Nancy Bachme_<br>Deputy Clerk, U.S. District Court |

UNITED STATES OF AMERICA,

v.

JAMSHID GHOMI,

      Defendant

Case No. 8:26-mj-00369-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date unknown, but no later than March 2009, and continuing through the date of this Complaint, in the County of Orange, in the Central District of California and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a), (c); 31 C.F.R. Part 560 | Conspiracy to Violate the International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

 

_/s/ Ryan Roberson_
Complainant's signature

Ryan Roberson, IRS-CI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone

Date:     June 2, 2026

_Judge's signature_

City and state:   Santa Ana, California

Hon. Douglas F. McCormick, U.S. Magistrate Judge
Printed name and title

AUSA: <u>David Lachman x5564</u>

**AFFIDAVIT**

I, Ryan Roberson, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Jamshid GHOMI ("GHOMI") for a violation of 50 U.S.C. § 1705(a), (c), and 31 C.F.R. Part 560 (Conspiracy to Violate the International Emergency Economic Powers Act).

2.   This affidavit is also made in support of search warrants for the following:

a.   The premises located at 31 High Water, Newport Coast, California, as described more fully in Attachment A-1 ("SUBJECT PREMISES"); and

b.   The person of GHOMI, as described more fully in Attachment A-2.

3.   The items to be seized are described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 50 U.S.C. § 1705(a), (c) (the International Emergency Economic Powers Act); 31 C.F.R. Part 560 (the Iranian Transactions and Sanctions Regulations); 50 U.S.C. §§ 4801-4852 (the Export Control Reform Act); 15 C.F.R. Parts 730-774 (the Export Administration Regulations); 13 U.S.C. § 305 (Unlawful Export Information Activities); 18 U.S.C. § 554 (Outbound Smuggling); 26 U.S.C. § 7201 (Attempting to Evade or Defeat Tax); 26 U.S.C. § 7206(1) (Fraud and False Statements); 18 U.S.C. § 1956 (Laundering of Monetary Instruments); 18 U.S.C. §

1

371 (Conspiracy to Commit the Aforementioned Offenses) (collectively, the "Subject Offenses").  Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon a review of search warrant returns, my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and dates and amounts are approximations, and the words "on or about" and "approximately" are omitted for clarity. In addition, some of the documents and conversations referenced in this Affidavit, including bank ledgers, sales ledgers, contracts, and invoices, were in Farsi and have been translated into English using machine translation tools.

## II.    BACKGROUND OF THE AFFIANT

5.    I am a Special Agent with the Internal Revenue Service-Criminal Investigation ("IRS-CI") and have been so employed since October 2016.  As a Special Agent, I am assigned to investigate financial crimes where violations of the Internal Revenue Code and related offenses have occurred, including the investigation of money laundering offenses under Title 18, United States Code, Sections 1956 and 1957 and those statutes

2

which are contained in the Bank Secrecy Act as set forth in Title 31 of the United States Code.  I obtained a Certified Public Accountant license (inactive) issued by the California State Board of Accountancy in April 2014.  I have personally conducted investigations of alleged criminal violations of federal statutes related to public and foreign corruption, bribery, kickbacks, honest-services fraud, international money laundering, U.S. sanctions and export controls, tax crimes, currency reporting, narcotics, and counterintelligence.  I have testified in federal court on several occasions, including as the government's summary witness in a complex wire fraud case involving over $100 million of misappropriated funds.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities and criminal proceeds from detection by law enforcement authorities.  In addition, during the time I have been employed as a Special Agent, I have been assigned to investigations involving multi-agency jurisdictions.  These investigations regularly involved the tracing of currency and other proceeds flowing from illegal enterprises to assets and other monetary instruments.  Through this involvement, I have assisted domestically with the forfeiture of currency, bank accounts, and other assets, as well as the tracing of bank accounts and assets to seize internationally.

### III.  SUMMARY OF PROBABLE CAUSE

6.    GHOMI is a United States citizen who resides at the SUBJECT PREMISES in Newport Coast, California.  GHOMI founded Faraz Pardaz Rayaneh Co. Ltd. ("FPR"), a computer-networking company in Tehran, Iran, in October 1997, and is the company's Chief Executive Officer ("CEO").  Since at least 2009, GHOMI repeatedly used FPR to procure U.S.-origin networking equipment for customers in Iran in violation of U.S. sanctions and export controls, including sanctioned entities linked to the Iranian government's nuclear and military establishment.  GHOMI did so without ever obtaining a license from the Department of the Treasury's Office of Foreign Assets Control ("OFAC").

7.    GHOMI actively operated and managed FPR's illegal business operations.  As set forth below, GHOMI personally identified, negotiated, purchased, and arranged the shipment of large quantities of controlled U.S. equipment for FPR.  Between March 2009 and May 2023, GHOMI used his PayPal and eBay accounts to make hundreds of purchases of U.S.-origin Cisco, Juniper, Extreme Networks, and similar networking equipment, often directing the goods to intermediaries in the United Arab Emirates ("UAE").  As recently as 2023, GHOMI also personally negotiated the purchase of Cisco equipment directly from U.S. suppliers, routing it through UAE front companies and on to FPR in Iran.  None of these items could lawfully be exported or supplied to Iran without authorization from OFAC, which GHOMI never sought or obtained.  Many of the items were also controlled under the Export Administration Regulations ("EAR")

4

for reasons of national security, anti-terrorism, or encryption, and thus carried independent licensing requirements administered by the U.S. Department of Commerce's Bureau of Industry and Security ("BIS").  To move the goods, GHOMI arranged the shipment of more than 250,000 kilograms of networking equipment from the UAE to FPR in Iran between 2014 and 2018 alone, using UAE front companies and freight forwarders to disguise that Iran was the true destination.

8.    GHOMI knew this conduct was unlawful and took deliberate steps to conceal it.  He directed his UAE co-conspirators to keep his name off shipping paperwork, to omit invoices from shipments bound for Iran, and on at least one occasion to physically hide U.S.-origin Cisco equipment inside a larger shipment.  GHOMI personally received warnings on invoices, shipping documents, and software licenses that exporting these goods to Iran was prohibited.

9.    According to FPR's own records, the company's annual sales exceeded $10 million, and its clientele included hundreds of Iranian companies and government entities.  A relatively small but significant portion of that business went to the most sensitive end-users in Iran: the Iranian government's nuclear and military establishment.  From at least 2017 through 2023, FPR sold U.S.-origin Cisco networking equipment to the Atomic Energy Organization of Iran ("AEOI") -- the government agency responsible for Iran's nuclear program -- as well as to AEOI subsidiaries responsible for nuclear-power development and nuclear-fuel production, including entities specifically

sanctioned by OFAC.  Separately, from at least 2014 through 2022, FPR supplied Cisco networking, security, and encryption equipment to Iran's Ministry of Defense and Armed Forces Logistics and to affiliated military and defense-electronics entities, including entities specifically sanctioned by OFAC.

10.  GHOMI laundered the proceeds of his illegal business into the United States.  FPR deposited its Iranian sales revenue into its operating account at Bank Melli, and GHOMI swept those funds to himself by causing FPR to purchase U.S. dollars and, within days, receiving matching wires into his U.S. accounts from a rotating set of unrelated trading companies and exchange houses in places such as the British Virgin Islands, Hong Kong, Turkey, and the UAE.  The wires bore false descriptions -- commercial pretexts such as "Buying Goods" and "For Consulting Fees," and, in other instances, references to the estate of GHOMI's late father.  Between 2011 and 2024, GHOMI moved more than $15 million from Iran into his U.S. bank accounts and a construction escrow account held on his behalf, and he falsely reported those funds to the IRS as foreign inheritance.  GHOMI's own tax returns reported almost no income, his highest reported income in any year being $20,684, and he often claimed the Earned Income Tax Credit.

11.  GHOMI used these proceeds to acquire and build the SUBJECT PREMISES.  He purchased the vacant Newport Coast lot in March 2010 for $4,490,000 and paid approximately $10,490,371 to construct the residence between 2010 and 2013.  Between May 2011 and August 2015, foreign-source wires totaling $7,031,791 --

6

from many of the same trading companies as the transfers from FPR's operating account, handled by the same FPR employees, and bearing the same inheritance and commercial pretexts described above -- flowed into the escrow account that funded the construction.

12.  For these reasons, and as set forth in detail below, there is probable cause to believe that GHOMI has conspired to violate IEEPA and the ITSR, and that evidence, fruits, and instrumentalities of the Subject Offenses will be found at the SUBJECT PREMISES and on GHOMI's person.  There is also probable cause to believe that the SUBJECT PREMISES was built with the proceeds of GHOMI's sanctions-evasion conspiracy.

### IV.  SUMMARY OF APPLICABLE EXPORT LAWS

13.  Based on my training and experience, I am aware that the United States regulates the export of commodities and technology having commercial and military applications.  U.S. export controls are intended to advance national security, foreign policy, and non-proliferation goals, utilizing a combination of federal statutes and regulations, as well as multilateral coordination with other nations through robust international export control regimes.

**A.    IEEPA and the Sanctions on Iran**

14.  The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 et seq, authorizes the President to impose trade sanctions on a foreign country in response to unusual and extraordinary threats to the national security, foreign policy, and economy of the United States presented by

7

that country.  Beginning in 1995, by Executive Orders and pursuant to the authority in the IEEPA, the President imposed such sanctions on Iran. Among those sanctions are the Iranian Transactions and Sanctions Regulations ("ITSR"), which were promulgated under the authority of the President's Executive Orders and the IEEPA, and which are administered by OFAC. See 31 C.F.R. Part 560.

15.  Under the ITSR, unless a person obtains an export license from OFAC, or unless an export transaction falls within a limited set of enumerated general licenses or authorizations, goods, technology, and services may not be exported, reexported, sold, or supplied, directly or indirectly, from the United States, or by a United States person, wherever located, to Iran.

16.  Specifically, Title 31, Code of Federal Regulations, Section 560.206 prohibits a United States person from transacting or dealing in goods or services owned by the Government of Iran, as set forth below:

(a) Except as otherwise authorized pursuant to this part . . . , no United States person, wherever located, may engage in any transaction or dealing in or related to:

(1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or

(2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.

(b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

17.  In addition, Section 560.205 of the ITSR prohibits the supply of goods or services to Iran, as set forth below:

> The exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran. . . .

18.  Section 560.208 (Prohibited facilitation by United States persons of transactions by foreign persons) of the ITSR provides:

> Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.

19.  In addition, pursuant to § 560.208 of the ITSR, U.S. persons are not allowed to acquire or own a business interest in Iran because any new investment by U.S. persons in Iran has been prohibited since May 7, 1995.  Therefore, unless otherwise authorized, the ownership or operation of a company located in Iran by a U.S. person is prohibited.

20.  Further, 31 C.F.R. § 560.215 (Prohibitions on foreign entities owned or controlled by U.S. persons) provides:

9

Except as otherwise authorized pursuant to this part, an entity that is owned or controlled by a United States person and established or maintained outside the United States is prohibited from knowingly engaging in any transaction, directly or indirectly, with the Government of Iran or any person subject to the jurisdiction of the Government of Iran that would be prohibited pursuant to this part if engaged in by a United States person or in the United States.

(b)(1) For purposes of paragraph (a) of this section, an entity is "owned or controlled" by a United States person if the United States person (i) Holds a 50 percent or greater equity interest. . . .

21.  Section 560.203 of the ITSR provides:

(a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

22.  Pursuant to IEEPA, 50 U.S.C. § 1705, it is a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

**B.    The Export Control Reform Act**

23.  On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801-4852.  In part, ECRA provides permanent statutory authority for the EAR.  ECRA provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that

10

the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled. . . ."  50 U.S.C. § 4811(2).  To that end, ECRA grants the President the authority to control "(1) the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information.  Id. at § 4812(a).  ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

24.  ECRA prohibits willful violations of, among other things, the EAR.  Specifically, pursuant to 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this part or of any regulation, order, license, or other authorization issued under this part," and pursuant to § 4819(b) "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall" be guilty of a federal crime.

**C.   The Export Administration Regulations**

25.  Under the ECRA, as under the IEEPA previously, the Department of Commerce reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR, 15 C.F.R. Parts 730-774.  In particular, the EAR restricts the

export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.  Items subject to the EAR are not limited to commodities in the United States or those moving in transit; U.S.-origin items regardless of location, as well as certain activities of U.S. and foreign persons are also captured in the regulatory jurisdiction and scope of the EAR.

26.  The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. Part 774, Supp. No. 1.  Items on the CCL are identified by an Export Control Classification Number ("ECCN"), which sets forth a description of the controlled commodity or technology, its licensing requirements, any potential license exceptions, and the reasons for its export control (e.g., National Security ("NS"), Missile Technology ("MT"), Anti-Terrorism ("AT"), Regional Stability ("RS")).

27.  Depending on the nature of the item, the destination country, the end-use, and the end-user of the item, a license from BIS may be required for export.  By referencing the reasons for control set forth in the applicable ECCN, the Commerce Country Chart specifies those countries for which a license is required before a commodity may be exported there.  See 15 C.F.R. Part 738, Supp. No. 1.  Although there may be an

12

export license requirement, an export transaction might be eligible for a license exception.  A license exception is an authorization permitting the export of items under specific conditions, alleviating the need to apply for a BIS Export License.

28.  ECCN 5A002, which includes "information security" systems, equipment and "components", is controlled on the CCL for reasons of National Security, Anti-Terrorism, and Encryption Items.  See 15 C.F.R. Part 774, Supp. No. 1.  Furthermore, a licensing requirement for Iran appears in § 746.7(a)(1)(i) for controls of National Security and Anti-Terrorism reasons. Additionally, a license requirement for Iran appears in § 742.15 for controls of Encryption Items.  See 15 C.F.R. Part 738, Supp. No. 1.

29.  Items that are not on the CCL, but remain subject to the EAR, are classified as EAR99.  EAR99 items generally do not require a BIS license or license exception to be exported to most destinations.  Regardless of an item's EAR classification, however, the ITSR prohibits the export, reexport, sale, or supply of any item -- including EAR99 items -- to Iran, directly or indirectly, without authorization from OFAC.  An EAR99 item that may be exported to the UAE without a BIS license can thus be declared in the Automated Export System using the "No License Required" ("NLR") designation, even though that same item may not lawfully be exported or reexported to Iran without OFAC authorization.  Based on my training and experience, individuals seeking to unlawfully export items to Iran often route them

13

through the UAE, while declaring them as NLR, to circumvent the licensing and authorization requirements that apply to exports and reexports destined to Iran.

**D.    Unlawful Export Information Activities**

30.   Title 13, United States Code, Section 305(a)(1) provides:

> Any person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

31.   The Department of Commerce, through the U.S. Census Bureau, requires the filing of electronic export information ("EEI"), the electronic successor document to the SED, through the Automated Export System ("AES") pursuant to 13 U.S.C. § 305, the EAR, and Title 15, Code of Federal Regulations, Part 30 (the Foreign Trade Regulations).  The purpose of these requirements is to strengthen the United States government's ability to prevent the export of certain items to unauthorized destinations and end-users because the AES aids in targeting, identifying, and when necessary, confiscating suspicious or illegal shipments prior to exportation.  15 C.F.R. § 30.1(b).  At all times relevant to the matters alleged herein, an EEI was required to be filed for, among other things, the export of commodities valued over $2,500 per the Harmonized Tariff Schedule of the United States of America commodity classification code or any commodity requiring an export license.  An EEI was required to

14

contain, among other information, the names and addresses of the parties to the transaction (including the U.S. Principal Party in Interest ("USPPI") and the location and identity of the ultimate consignee receiving the commodity), the description, quantity, and value of the items exported, and the ECCN and export license number if applicable.  See 15 C.F.R. § 30.6(a).  The USPPI is the person or legal entity in the United States that receives the primary benefit, monetary or otherwise, from the transaction.  The ultimate consignee is the person located abroad "who receives the exported or reexported items.  The ultimate consignee is not a forwarding agent or other intermediary but may be the end-user."  15 C.F.R. § 772.1.

32.  I know based on my training and experience that exports to Iran must be declared in the AES.  Misrepresentation or concealment of any material fact to BIS or to an official of any other U.S. agency may be a violation of § 764.2(g) of the EAR.  The person who files an EEI to the AES is responsible for the truth, accuracy, and completeness of the EEI, except insofar as that person can demonstrate that the declaration reasonably relied on information furnished by others (e.g., the ultimate consignee).[1]

**E.    Outbound Smuggling**

33.  Title 18, United States Code, Section 554 provides in relevant part:

---

[1] Export Clearance Requirements and Authorities https://www.bis.doc.gov/index.php/documents/regulation-docs/2257-part-758-export-clearance-requirements-1/file (last accessed on May 22, 2026).

15

Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

## V.    STATEMENT OF PROBABLE CAUSE

34.   As set forth below, based on my review of emails and other records, GHOMI has conspired with others to procure U.S.-origin computer networking equipment on behalf of his company FPR in Iran for sale to Iranian end users, including Iran's nuclear agency, Iran's ministry of defense, and the Iranian military.

### A.    GHOMI, a U.S. Citizen, Owns and Operates FPR, an Iranian Company that Supplies U.S.-Origin Computer Networking Equipment to Iranian SDNs and Other Iranian Customers

35.   According to U.S. Department of Homeland Security ("DHS") records, GHOMI was born in Iran and became a naturalized U.S. citizen on August 28, 1989. GHOMI resides in Tehran, Iran, and at the SUBJECT PREMISES in Newport Coast, California. As set forth below, GHOMI recently returned from Iran and is currently residing at the SUBJECT PREMISES.

#### 1.    GHOMI Owns and Operates FPR

36.   In October 1997, GHOMI established FPR, a computer networking equipment company headquartered in Tehran, Iran.[2]

_____

[2] FPR is sometimes referred to in documentation as Faraz Pardaz Computer ("FPC") but based on my review of emails and

16

According to FPR's formal financial statements for the fiscal year from March 2022 to March 2023, GHOMI, his wife, and his two sons were FPR's only shareholders, each holding a 25% interest in the company.  DHS records reflect that GHOMI's wife and his sons are U.S. citizens.  FPR is thus a foreign entity that is wholly owned or controlled by U.S. persons.

      a.   FPR's Notice of Incorporation, published in Iran's Official Gazette, reflects that FPR was established in Tehran, Iran, on October 23, 1997, for the purpose of importing computer equipment. GHOMI was elected as the company's CEO and Chairman of the Board of Directors, and his wife was elected as the Vice-Chairman of the Board of Directors.

      b.   FPR's Articles of Association reflect that FPR is an Iranian company in the business of importing computer equipment.  All profits are to be distributed to the company's shareholders at the end of each fiscal year, after setting aside a legal reserve.  The document is signed by GHOMI and his wife.

      c.   FPR's place of business is 405 West Taleghani Avenue, Tehran, Iran.  According to a lease agreement, GHOMI leased a floor of the property to FPR from February 2017 to February 2021.  GHOMI signed the lease as both the landlord and the tenant, and FPR's official stamp appears at the bottom of the document.

---

other records, the two company names refer to the same Iranian company owned and operated by GHOMI.  According to internet searches, "rayaneh" is the Persian word for "computer."

37.    FPR's contracts and other documents identify GHOMI as FPR's highest ranking executive and essential to FPR's operations.  For example:

a.    A January 2017 distributorship agreement between FPR and Nexans Network Solutions NV ("Nexans"), a manufacturer of structured cabling,[3] stated that "the fact that Mr./Messrs. JAMSHID GHOMI is/are part of the distributor's personnel active in the performance of this Agreement was an essential condition for [Nexans] to enter into this Agreement."  GHOMI signed the distributorship agreement as FPR's president, and the agreement bears FPR's official stamp.

b.    According to a Schedule 1 to the Nexans distributorship agreement, FPR had 39 employees and its total turnover (sales) over the three years preceding the agreement was approximately €30 million (or approximately $33-38 million in U.S. dollars at then-prevailing exchange rates).  The document identified FPR's bank as Bank Melli Iran.[4]  GHOMI signed the schedule as FPR's representative.

---

[3] Based on open-source research, I know that Nexans Network Solutions NV is a Belgian subsidiary of Nexans, a global cable manufacturing company headquartered in Paris, France. Structured cabling is a standardized system of cables, connectors, and related hardware to support the transmission of data, voice, and video signals throughout a building or campus.

[4] OFAC designated Bank Melli Iran as an SDN on November 5, 2018, for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"). See https://home.treasury.gov/news/press-releases/sm541 (last accessed May 22, 2026).

18

c.    On January 22 and 25, 2022, an FPR sales manager ("Co-Conspirator-2") submitted a contractor qualification form to AEOI, the agency responsible for Iran's nuclear program, attaching copies of FPR's Notices of Incorporation from Iran's Official Gazette and GHOMI's and his wife's identification documents in response to a request from the nuclear agency for documentation of FPR's ownership.  The identification documents included photos of GHOMI and his wife.  The contractor qualification form stated that GHOMI serves as both Managing Director and Chairman of the Board, holding sole executive authority over the company.  The form also identified GHOMI, Co-Conspirator-2, and an FPR engineer ("Co-Conspirator-4") as FPR's key personnel.

d.    On April 20, 2022, an FPR sales employee ("Co-Conspirator-3") sent copies of various FPR corporate documents to Marun Petrochemical Company.[5]  The email attached copies of GHOMI's Iranian identification card and a passport booklet, which both contain GHOMI's photo.

2.    FPR Supplies U.S. Networking Technology to Iranian Customers

38.    FPR provided Cisco, Juniper Networks, and Extreme Networks networking equipment to its customers, in addition to Nexans products.  For example:

a.    In a letter dated November 6, 2014, to an Iranian petrochemical company, FPR represented that it was the "first

---

[5] On June 16, 2022, OFAC designated Marun Petrochemical Company as an SDN pursuant to E.O. 13846.

and largest supplier of Cisco networking equipment (switch, router, wireless, firewall),[6] Juniper Networks security equipment (firewall and IDP),[7] Nexans equipment (fiber-optic / copper connectivity: cable, outlet, patch panel. . .) . . . and Extreme Networks equipment (switch).[8]  Based on my training and experience, I know that many products manufactured by Cisco, Juniper, and Extreme Networks are subject to U.S. export-control regulations administered by the U.S. Department of Commerce's Bureau of Industry and Security.

b.    In a letter dated October 14, 2008, a UAE trading company confirmed that FPR in Tehran, Iran, was the trading company's "authorized sales partner and agent" for "**Juniper Networks** Products" and was "authorized to supply and support of Juniper Networks products in I.R.IRAN" (emphasis in original)

c.    The contractor qualification form Co-Conspirator-2 submitted to AEOI on January 22 and 25, 2022, discussed below, stated that FPR specialized in selling Cisco, Extreme Networks, and Nexans networking equipment.

---

[6] Cisco Systems, Inc. ("Cisco"), a U.S. company headquartered in San Jose, California, is the world's largest manufacturer of enterprise computer networking equipment, including routers, switches, firewalls, and related software and hardware used to operate computer networks.

[7] Juniper Networks, Inc. ("Juniper"), a U.S. company headquartered in Sunnyvale, California, is a manufacturer of enterprise computer networking equipment, including routers, switches, firewalls, network-security appliances, and related software and hardware.

[8] Extreme Networks, Inc. ("Extreme Networks"), a U.S. company headquartered in Morrisville, North Carolina, is a manufacturer of enterprise computer networking equipment, including switches, routers, wireless-networking products, and related software and hardware.

39.    FPR's audited financial statements for March 2022 to March 2023 (corresponding to Persian year 1401) reflect that sales of Cisco equipment were the core of FPR's business.  In that year, FPR recorded approximately 566 billion Iranian rials in sales of Cisco equipment, constituting approximately 78 percent of FPR's total product sales by value.[9]

3.    FPR's Customers Include Numerous OFAC-Sanctioned Entities

40.    FPR's corporate records, including bank and sales ledgers, show that FPR sold computer networking equipment to a wide array of Iranian customers, including state-owned and private banks, Iranian petrochemical and energy companies, Iranian mining and steel companies, and other IT companies. Many of these companies were subject to U.S. sanctions. Notably, FPR's Iranian customer base also included governmental entities affiliated with Iran's nuclear program and the Iranian military.

a.    FPR's customers included the following entities associated with Iran's nuclear program:  AEOI, the Iranian

---

[9] The value of the Iranian rial against the U.S. dollar varied widely between 2011 and 2025, declining from approximately 10,800 rials per dollar at the Central Bank of Iran's official rate in 2011 (and roughly 13,500 rials per dollar on the open market) to more than 800,000 rials per dollar on the open market by 2025.  Iran maintained multiple, widely divergent exchange rates.  During Persian year 1401, the Central Bank's "preferential" rate was 42,000 rials per dollar; the Central Bank's managed rate for commercial import-export trade stood at approximately 285,000 rials per dollar; and the free-market rate ranged from approximately 250,000 rials per dollar at the start of 1401 to approximately 540,000–575,000 by year-end.  Converted at the managed rate for commercial transactions in 1401, 566 billion rials would equate to approximately $2 million.

government agency responsible for research and development activities in the field of nuclear technology; the Nuclear Power Production and Development Company of Iran ("NPPD"), an AEOI-subsidiary responsible for Iran's nuclear power program; and Nuclear Fuel Production and Procurement Company ("NFPC"), an AEOI-subsidiary which according to U.K. sanctions is involved in uranium enrichment-related activities.[10]  FPR's customers also included the Nuclear Power Plants Repairs and Support Company ("TPNA"), an AEOI-affiliated company that provides repairs and support for Iran's only operating nuclear power plant.  AEOI and NPPD are Specially Designated Nationals ("SDNs").

b.    FPR's military customers included Iran's Ministry of Defense and Armed Forces Logistics  ("MODAFL"); Joint Staff of the Army, the military command body of Iran's regular army; and Iran Electronics Industries ("IEI," also known as "SAIRAN") and its affiliated companies, including Information Systems of Iran Company ("ISIRAN").  MODAFL, IEI, and ISIRAN are SDNs.

**B.    GHOMI Procured U.S. Computer Networking Equipment on Behalf of FPR in Iran**

41.  Beginning in or about March 2009 and continuing through at least 2024, GHOMI procured U.S.-origin networking equipment for FPR's Iranian customers and arranged for that equipment to be transshipped to Iran through intermediaries in the UAE.  GHOMI procured the equipment through three principal channels.  GHOMI made personal purchases from individual U.S.

---

[10] See https://search-uk-sanctions-list.service.gov.uk/designations/INU0367/Entity

sellers -- predominantly through eBay, paid through his personal PayPal account or U.S. credit cards in his name -- and arranged for those purchases to be delivered to UAE intermediaries for onward delivery to FPR in Iran.  GHOMI purchased larger quantities of Cisco networking equipment from foreign resellers and routed that equipment through Co-Conspirator-6's Dubai company, Flexinet Technologies LLC ("Flexinet"), and through UAE freight forwarders for onward delivery to FPR in Iran.  In 2023, GHOMI directed Co-Conspirator-5 to procure Cisco networking equipment from U.S. companies through Co-Conspirator-5's Dubai company, MBE Trading LLC, for onward transfer to FPR in Iran. Across all three channels, GHOMI, FPR employees, and the UAE intermediaries used freight forwarders to arrange the transportation of the equipment to Iran, as discussed in Section V.C below.

        1.    <u>GHOMI's Procurement of U.S.-Origin Networking Equipment Through eBay and PayPal</u>

42.  From approximately March 2009 to May 2023, GHOMI used personal U.S. financial and shipping accounts in his own name to procure U.S.-origin networking equipment and arrange for its delivery to the UAE for transshipment to FPR in Iran.  GHOMI placed orders predominantly through eBay and paid for the purchases using a PayPal account and U.S. credit cards in GHOMI's name.  GHOMI then arranged for the equipment to be delivered to intermediaries in the UAE.  In some instances, GHOMI directed the seller to ship the equipment directly to the UAE intermediary.  In other instances, GHOMI received the

equipment at his U.S. residence -- a residence in Irvine, California from 2009 to 2015, and then the SUBJECT PREMISES from April 2015 to May 2023 -- and then shipped the equipment via FedEx to Co-Conspirator-6 in the UAE.

43.  According to eBay records, GHOMI registered an eBay account on January 13, 2009 under eBay User ID "babri63."  The account registration information listed GHOMI's full name ("Jamshid Ghomi") and GHOMI's Gmail address.  Beginning in March 2015, the physical address listed on the eBay account was SUBJECT PREMISES.  According to PayPal records, GHOMI opened a PayPal account on January 14, 2009.  The account documentation listed GHOMI's Gmail email address, date of birth and social security number.

44.  Between March 2009 and May 2023, GHOMI used his PayPal and eBay accounts to purchase more than $650,000 of U.S.-origin networking equipment and electronics.  The items GHOMI procured, primarily via eBay, included routers, firewalls, switches, and modules manufactured by Cisco Systems, Juniper Networks, Extreme Networks, and Hewlett Packard.

      a.   GHOMI Purchased Networking Equipment Through eBay and PayPal for Shipment Directly to UAE Intermediaries

45.  According to PayPal records, GHOMI directed sellers to ship more than 90 PayPal-funded purchases directly to intermediaries in the UAE from March 2009 through November 2017. At least 66 of those shipments were for U.S.-origin networking equipment, valued at more than $108,000.

46. From March 2009 to at least December 2012, GHOMI directed that goods corresponding to approximately 34 PayPal transactions for networking equipment, totaling approximately $69,000, be sent to Green Gold General Trading LLC ("Green Gold"), a UAE company that had designated FPR as its authorized agent in Iran.

a. On March 27, 2009, GHOMI added an address in Dubai, UAE, for Green Gold as the address where purchases made with his PayPal account could be sent. GHOMI updated Green Gold's Dubai shipping address in June 2010 on both his PayPal and eBay accounts.

b. The items purchased via GHOMI's PayPal account and shipped to Green Gold in the UAE included Cisco switches, modules, and supervisor and route-processor cards, Juniper firewalls and intrusion-detection appliances, and HP networking equipment.

47. From September 2013 to November 2017, GHOMI directed that goods corresponding to approximately 56 PayPal transactions for the networking equipment, totaling more than $102,000, be sent to Flexinet Technologies LLC, a UAE company headed by Co-Conspirator-6.

a. In December 2014, GHOMI added Co-Conspirator-6's UAE address as a saved shipping address on GHOMI's PayPal account and re-confirmed it as a saved shipping address in September 2016.

b. The items purchased via GHOMI's PayPal account and shipped to Co-Conspirator-6 in the UAE included Cisco

25

transceiver modules, line cards, wireless controllers, and routers, as well as HP and Juniper networking modules.

48.  The following transactions are representative of GHOMI's shipment of U.S.-origin networking equipment to Green Gold and Flexinet in the UAE:

a.  On March 30, 2009, GHOMI purchased a Juniper SSG-550-001 Netscreen 550 Gateway Firewall from a U.S. eBay seller for $3,099.  GHOMI paid through his PayPal account.  The shipping address recorded in the PayPal transaction was "GREEN GOLD LLC., GREEN CORNER BUILDING, AL RIGA ROAD, DEIRA, DUBAI" in the UAE.

b.  On May 18, 2009, GHOMI used his PayPal account to purchase three Cisco VIP6-80 network modules from a seller with a French email domain for £3,300 GBP.  The shipping address recorded in the PayPal transaction was "GREEN GOLD LLC., GREEN CORNER BUILDING, AL RIGA ROAD, DEIRA, DUBAI" in the UAE. The notes column for the transaction included instructions to undervalue and mislabel the shipment. The notes read, in part: "SHIP THESE 3 PCS OF NEW CISCO MODULE VIP6-80 TO: GREEN GOLD L.L.C … UNDER INVOICE TO $50 EACH , TOTAL $150 S USED NETWORK MODULE. EMAIL ME THE TRACKING NUMBER. THX. JIMMY."

c.  On October 10, 2011, GHOMI purchased a Cisco WS-X6148A-GE-TX network module from a German eBay seller for $1,430.  GHOMI paid through his PayPal account.  The shipping address recorded in the PayPal transaction was "GREEN GOLD L.L.C., 208 GREEN CORNER BUILDING, AL-RIGA ROAD, DEIRA, DUBAI" in the UAE.  The notes column for the transaction read: "PLEASE

26

CHECK TO MAKE SURE THE ITEM SEND IS NEW IN ORIGINAL PACKAGING AND IT IS FROM NEW CISCO LOGO AND MANUFACTURING.  PLEASE DOUBLE BOX SO THE OROIGNAL PACKING WONT GET DAMAGE AND SHIPPING LABEL IS NOT ON THE ORIGINAL PACKING.  THANKS, JIMMY."

d.    On January 14, 2015, GHOMI purchased Cisco WS-C4948E network switches from an eBay seller for $9,700 for shipment to Co-Conspirator-6 in the UAE.

e.    On August 7, 2017, GHOMI purchased six Cisco WS-F6K-DFC4-AXL Catalyst 6500 Distributed Forwarding Cards from an eBay seller for $4,125 for shipment to Co-Conspirator-6 in the UAE.  GHOMI paid using his PayPal account and asked the seller to let him know the tracking number once the items were shipped.

b.    <u>GHOMI Shipped Networking Equipment from the SUBJECT PREMISES to Co-Conspirator-6 in the UAE</u>

49.  In March 2015, GHOMI changed the primary shipping address on his PayPal account to the SUBJECT PREMISES.  From March 2015 to May 2023, GHOMI received approximately 362 shipments of U.S.-origin networking equipment purchased via eBay or PayPal at the SUBJECT PREMISES.  GHOMI then reshipped many of these items to Co-Conspirator-6 in the UAE.

50.  According to FedEx records, between October 2013 and November 2022, GHOMI sent at least 72 FedEx shipments to Co-Conspirator-6 in the UAE.  The vast majority of these shipments were sent from the SUBJECT PREMISES, beginning in or about April 2015, with the remaining shipments sent from GHOMI's prior residence in Irvine, California.  The FedEx shipping labels and commercial invoices for these shipments identified GHOMI as the

27

shipper, listed GHOMI's U.S. residence as his address, and often described the contents as networking or electronic equipment. For example:

a.    The FedEx shipping label for a package GHOMI sent on September 29, 2017, from the SUBJECT PREMISES to Co-Conspirator-6 in the UAE described the contents as "REFURBISH USED PWR SUPPLY" and "REFURBISHED NETWORK MODULE[S]."  GHOMI declared a value of $1,230 for the shipment, which weighed 19 pounds.

b.    The FedEx shipping label for a package GHOMI sent on May 3, 2018, from the SUBJECT PREMISES to Co-Conspirator-6 in the UAE described the contents as "ELECTRONIC PARTS - Used memory ram."  The commercial invoice for the package listed GHOMI's Gmail address.

c.    The FedEx shipping label for a package GHOMI sent on June 2, 2022, from the SUBJECT PREMISES to Co-Conspirator-6 in the UAE, with a declared value of $530, described the contents as "Connectors."  The commercial invoice stated that the package contained 106 "connectors" manufactured in Malaysia. Additionally, the commercial invoice, signed by GHOMI, included the following declaration:

> These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified.  They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and

28

regulations.  I declare that all the information contained in this invoice to be true and correct.

| Declaration Statement(s) | | | Handling | 0 00 |
|---|---|---|---|---|
| These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations. | | | Other | 0 00 |
| I declare that all the information contained in this invoice to be true and correct. | | | Invoice Total | 530 00 |
| Originator or Name of Company Representative if the Invoice is being completed on behalf of a company or Individual  JAMSHID GHOMI | | | Currency Code | USD |
| Signature / Title / Date | | | | 02 Jun 2022 |

REV 04 10 13-1.08

d.   The FedEx shipping label for a package GHOMI sent on November 1, 2022, from the SUBJECT PREMISES to Co-Conspirator-6 in the UAE, with a declared value of $400, described the contents as "USED NETWORK MODULE" and "Optical CD Player Mechanism."[11]  According to the commercial invoice, the package contained two used network modules and two optical CD player mechanisms.  The commercial invoice, signed by GHOMI, included the same export-control warning set forth in the subparagraph above.

51.  On May 26, 2023, an Export Control Officer ("ECO") in Dubai attempted to contact Co-Conspirator-6 to conduct Post-Shipment Verification ("PSV") checks on the June and November 2022 FedEx shipments discussed above.[12]  Although Co-Conspirator-6 initially did not respond to the ECO's messages, the ECO eventually was able to meet with Co-Conspirator-6 on June 14, 2023.  During the meeting:

---

[11] The consignee on this shipment was listed as a variant of Co-Conspirator-6's name, which based on my review of email correspondence I believe is an alias Co-Conspirator-6 used.

[12] PSVs are End-Use Checks which are conducted to confirm the lawful receipt and use of items subject to the EAR following the issuance of a license or export, reexport, or transfer (in-country) under a license exception or "no license required."

a.    Co-Conspirator-6 told the ECO that he met GHOMI at a trade seminar in the UAE and has been friends with GHOMI for approximately 15 years.

b.    Co-Conspirator-6 told the ECO that he was familiar with U.S. export controls, including sanctions against countries such as Iran, Syria, North Korea, and Cuba, as well as prior U.S. sanctions against Sudan.

c.    Co-Conspirator-6 claimed that all Flexinet's sales were exclusively on the local market to walk-in customers and retailers.  According to Co-Conspirator-6, Flexinet did not deal with resellers, opting instead to deal only with retail customers, because extending credit lines to resellers was a high-risk business practice.

d.    Co-Conspirator-6 also stated that the COVID-19 pandemic had hit his company hard, causing Flexinet to go out of business in 2022.[13]

e.    With respect to the two shipments in question, Co-Conspirator-6 brought two network modules and a CD player head to the meeting for the ECO to inspect.  Co-Conspirator-6 had previously informed a BIS commercial specialist that the items were stored at his friend "Jamshid's" house.  When asked if GHOMI was in the UAE, Co-Conspirator-6 clarified that GHOMI was located in the United States.  During the meeting, Co-

---

[13] Based on a business license obtained from the UAE Ministry of Economy National Economic Register website, it appears that Flexinet's business license expired on May 21, 2022, prior to the June 2022 and November 2022 shipments from GHOMI to Co-Conspirator-6.

30

Conspirator-6 claimed that he did not have the other 106 connector modules available for inspection.  According to Co-Conspirator-6, after his company went out of business, he stored the remainder of his inventory at a friend's house.  Co-Conspirator-6 did not provide the full name of this friend.

52.  On June 14, 2023, the ECO requested that Co-Conspirator-6 provide a photograph of the connectors, along with accompanying import documentation.  Following the meeting, on June 21, 2023, after Co-Conspirator-6 did not provide the requested documentation for the two shipments, the ECO determined that Flexinet was an unreliable recipient of items subject to the EAR.[14]

53.  Co-Conspirator-6's statement to the ECO that Flexinet sold only to walk-in customers and retailers was false.  As set forth elsewhere in this affidavit, in the years preceding the PSV, Co-Conspirator-6 procured and transshipped U.S.-origin Cisco and Juniper Networks equipment to FPR in Iran on numerous

---

[14] Based on my review of seized emails, it appears that after receiving the shipments of connectors and network modules from GHOMI via FedEx, Co-Conspirator-6 sent a package weighing approximately 10 kilograms to Co-Conspirator-5's company, MBE Trading, in Dubai on November 22, 2022.  Following the PSV meeting, the ECO wrote to Co-Conspirator-6, requesting "a photograph of the items along with accompanying import documentation" and an updated copy of Flexinet's commercial license.  The following day, Co-Conspirator-6 sought to have a courier retrieve the 106 Cisco networking connectors from MBE Trading.  Co-Conspirator-6 responded to the ECO on June 27, 2023, attaching photographs of the connectors and Flexinet's commercial license but writing that he "tried to find the supporting import documents and was unable to locate them."  By that time, the ECO had transitioned to a new assignment and had already submitted his report.

occasions, and in his emails to GHOMI referred to Iran as "Motherland."

>2. <u>GHOMI Procured U.S.-Origin Networking Equipment for FPR Through UAE Intermediaries and Foreign Resellers</u>

54. Based on my review of emails, invoices, and shipping records, GHOMI procured Cisco networking equipment for FPR in Iran through UAE intermediaries and foreign resellers. Co-Conspirator-6's company Flexinet served as an intermediary in the UAE, receiving networking equipment that GHOMI directed to it and brokering Cisco equipment for GHOMI's customers in Iran. GHOMI separately purchased substantial quantities of Cisco networking equipment from two foreign resellers, referred to herein as Foreign Reseller-1 and Foreign Reseller-2, which billed the equipment to Flexinet or delivered it to UAE freight forwarders for onward transshipment to FPR in Iran.

>a. <u>Co-Conspirator-6 Served as GHOMI's Intermediary in the UAE</u>

55. Co-Conspirator-6 operated Flexinet from offices in the Noor Talib Building in Bur Dubai, and served as GHOMI's intermediary in the UAE. As set forth above, GHOMI sent Co-Conspirator-6 dozens of FedEx packages of U.S.-origin networking equipment from the SUBJECT PREMISES and directed eBay sellers to ship dozens more directly to Flexinet. In 2023, Co-Conspirator-6 told an Export Control Officer that he had known GHOMI for 15 years and was familiar with U.S. sanctions against Iran. Co-Conspirator-6 received networking equipment that GHOMI directed to Flexinet, and he sourced and brokered Cisco and other

32

networking equipment for GHOMI in Iran, which Co-Conspirator-6 referred to as "Motherland."

56.   GHOMI typically negotiated a purchase himself and then directed Co-Conspirator-6 to carry it out.  For example, in May 2022, GHOMI negotiated with a China-based supplier to buy 116 Cisco DS-SFP-FC16G-SW transceivers at $45 each, to be paid through PayPal.  GHOMI then told the supplier that he would "arrange with my freind [sic] to take care of processing the order and payment," identified the friend as Co-Conspirator-6, and Co-Conspirator-6 "will contact you by email and arrange payment."  The same day, Co-Conspirator-6 emailed the supplier, "I'm the friend of Jimmy and as per the subject, he communicated with you for the purchase of Cisco DS-SFP-FC16G-SW Transceiver. . . . Jimmy informed me that he agreed for a price of US$ 45 ea for 116 PCs."  Co-Conspirator-6 provided a bill-to address at Flexinet in the UAE, designated a ship-to consignee at a freight forwarder in the Jebel Ali Free Zone, and arranged payment by PayPal.

57.   GHOMI directed networking equipment to Co-Conspirator-6 at Flexinet, kept him apprised of incoming shipments, and arranged for shipments to be handled in Flexinet's name rather than his own.  GHOMI sent Co-Conspirator-6 tracking numbers for incoming shipments, e.g., a UPS tracking number on August 20, 2018 for "5 PCS OF NETWORK SWITCH," and a DHL tracking number on February 20, 2019 for "ONE SMALL PACKAGE COMING FROM CHINA WITH 3 MODULES OF NIM INSIDE."  And on January 5, 2016, GHOMI told a UAE freight forwarder that an incoming shipment "IS UNDER

33

FLEXINET L.L.C," directing the freight forwarder to "FOLLOW UP ONLY UNDER FLEXINET L.L.C" and to "DO NOT BRING UP MY NAME."

58.  Co-Conspirator-6 also actively sourced and brokered Cisco and other networking equipment for GHOMI's customers in Iran.  On January 26, 2016, Co-Conspirator-6 sent GHOMI Cisco "Stocks Lists" and asked GHOMI to "forward the Cisco Stocks List and the List of Target Customers in Motherland to offer the products," adding that GHOMI "had told me to remind you within 2 days if you did not send the List of Customers."  GHOMI replied the next day: "YOU WILL HAVE BOTH LIST TODAY.  I HAVE ALREADY REQUESTED THE LIST OF CUSTOMERS."  Co-Conspirator-6 thereafter sent GHOMI Cisco offers for GHOMI's customers in Iran -- including, on July 19, 2016, a "Requirement from Motherland" that was a request for a Cisco adapter from a company in Tehran, Iran, to be quoted at a "landed price" for delivery there.

59.  Goods that GHOMI routed to Flexinet were collected in the UAE by Iranian freight forwarders for shipment to FPR in Iran.  For example, on February 27, 2017, Co-Conspirator-1 wrote to an Iranian freight forwarder, under the subject line "251558 RQN faraz pardaz": "SALAM, PLEASE ARRANGE FOR THIS PACKAGE TO BE PICKED UP TODAY.  Flexinet Technologies LLC . . . ONE BOX. PLEASE CONFIRM BACK."  The Iranian freight forwarder responded that day that the "Order is placed."  This was one of many emails in which Co-Conspirator-1 directed an Iranian freight forwarder to collect packages at Flexinet, with Co-Conspirator-6 listed as the contact, for onward transshipment to Iran.

34

> b.    GHOMI Purchased Cisco Equipment from Foreign Reseller-1

60.    Based on my review of emails and proforma invoices, between at least 2016 and 2019, GHOMI purchased substantial quantities of Cisco networking equipment from a foreign company that sold networking equipment on eBay and directly to GHOMI ("Foreign Reseller-1").[15]  GHOMI typically instructed Foreign Reseller-1 to ship the products to Flexinet or freight forwarders in the UAE.  Foreign Reseller-1 typically invoiced Flexinet in the UAE, not GHOMI or FPR.  For example:

a.    In May 2016, GHOMI purchased approximately 96 Cisco Catalyst 2960-X series switches and two route processors for approximately $120,000.  In September 2017, Foreign Reseller-1 issued two proforma invoices to Flexinet -- one for Cisco Catalyst 2960-X switches and Catalyst 3850 network modules totaling approximately $166,412, and one for 130 Cisco Catalyst 2960-X switches totaling approximately $93,589.

b.    In December 2017, Foreign Reseller-1 issued a proforma invoice to Flexinet for 80 Cisco Catalyst 3850-48T-L switches and 16 Cisco Catalyst 2960-X switches, totaling $200,000.

c.    On January 16, 2019, GHOMI emailed Co-Conspirator-6 a $20,000 proforma invoice from Foreign Reseller-1 for approximately 99 Cisco Catalyst 2960-X switches and stacking

---

[15] Based on my training and experience, I know that a proforma invoice refers to a price quotation issued in advance of sale and does not by itself establish that the quoted transaction was completed. FPR's ledgers, wire transfer records, emails, and shipping records reflect completed purchases from Foreign Reseller-1.

35

modules.  The invoice was billed to Flexinet and the ship-to address was a freight forwarder in the Jebel Ali Free Zone. GHOMI instructed Co-Conspirator-6, "PLEASE WIRE $20,000 AS PER PROFORMA."  Co-Conspirator-6 replied that he had set up the supplier's bank account in his online banking system and had "booked the payment," which would be processed to Foreign Reseller-1's bank account the next morning.

61.  Co-Conspirator-1 helped arrange payment for FPR's purchases of Cisco equipment from Foreign Reseller-1.  Based on my review of emails, Co-Conspirator-1 forwarded several of Foreign Reseller-1's proforma invoices to a money mover, who arranged the wire payments.  For example, Co-Conspirator-1 used a money mover to wire a series of payments to a Hong Kong bank account provided by Foreign Reseller-1 in early 2018.  Co-Conspirator-1 forwarded the payment confirmations to GHOMI, including confirmations of a $33,000 wire in January 2018 and $120,000 and $175,000 wires in March 2018.[16]

c.  GHOMI Purchased Cisco Equipment from Foreign Reseller-2

62.  Based on my review of emails and invoices, GHOMI also procured Cisco networking equipment from a Dubai-based reseller of Cisco, Juniper, and other networking equipment ("Foreign Reseller-2") from at least December 2015 through 2024.  GHOMI

---

[16] Although Foreign Reseller-1 typically issued its proforma invoices on the letterhead of a German company and listed a German bank account, it also directed that payment be wired instead to a bank account in Hong Kong held in the name of a different company.  Throughout this period, GHOMI dealt with the same individual at Foreign Reseller-1.

communicated directly with a representative of Foreign Reseller-2 and directed Co-Conspirator-1 and Co-Conspirator-6 to make payments to Foreign Reseller-2's bank accounts in the UAE.

63.  GHOMI communicated via email with Foreign Reseller-2, specifying the Cisco part numbers and quantities he wanted to purchase, and negotiated the prices.  For example, in May 2016, GHOMI assembled an order of Cisco Catalyst switches, Cisco ASA firewalls, and other equipment for which Foreign Reseller-2 issued a proforma invoice valued at $1,735,678.  The Foreign-Reseller-2 representative secured a 73.5% discount off list price, describing it as an "exceptional case" that "can be done only once in a year," and GHOMI pressed for more, writing that although they had "already agreed 73.5" for a $4 million order, "this is 6M as cash payment."  Across his orders from Foreign Reseller-2, GHOMI directed the purchase of hundreds of Cisco Catalyst 2960-X and 3850 switches, Cisco ASA firewalls, and Cisco ISR routers.

64.  GHOMI paid Foreign Reseller-2 in installments and in cash.  In October and November 2016, for an order valued at AED 3,259,295 (approximately $885,000), GHOMI made a series of transfers into Foreign Reseller-2's account totaling at least AED 2,500,000 between October 16 and November 1, 2016, writing, "WE WILL TRANSFER EVERY DAY."  GHOMI also directed Foreign Reseller-2 to collect payment in cash from Co-Conspirator-6.  In February 2019, for example, while GHOMI negotiated an order, he told Foreign Reseller-2, "YOU CAN PICK UP CASH FROM FLEXINET . . . AT TIME OF DELIVERY."

37

65.  Foreign Reseller-2 delivered the equipment to a freight forwarding company in the UAE ("UAE Freight Forwarder-1") for onward shipment to Iran.  As early as 2016, Foreign Reseller-2 released its shipments to UAE Freight Forwarder-1. In July 2016, for example, Foreign Reseller-2 prepared transfer documents in UAE Freight Forwarder-1's name and confirmed that the shipment had been collected.

66.  GHOMI's purchases from Foreign Reseller-2 continued for years.  Invoices dated July 2022 (for Juniper SRX equipment) and February 2024 (for 100 Cisco Catalyst 9200L switches) from Foreign Reseller-2 to UAE Freight Forwarder-1 were both recovered from one of GHOMI's iCloud accounts.

3.  In 2023, GHOMI Procured Cisco Networking Equipment from U.S. Companies for FPR in Iran Through the UAE

67.  In 2023, GHOMI procured Cisco networking equipment from U.S. Company-1, an IT supplier in Omaha, Nebraska, and U.S. Company-2, an IT supplier in Plymouth, Minnesota, for delivery to MBE Trading in the UAE and onward transfer to FPR in Iran. The transactions followed a consistent pattern: GHOMI identified the equipment and negotiated its purchase, frequently from his personal eBay and Gmail accounts; Co-Conspirator-5 placed MBE Trading's purchase orders and received the U.S. suppliers' invoices; the U.S. supplier shipped the equipment to MBE Trading in the UAE; and MBE Trading then invoiced FPR for the same equipment at a markup, recording delivery to a UAE freight forwarder for onward shipment to Iran.

68.   Between approximately April and October 2023, U.S. Company-1 sold Cisco networking equipment to MBE Trading in at least six invoices.  Each invoice listed MBE Trading in Dubai as both the bill-to and ship-to party, and certified that the equipment "was made in the U.S. and was exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. Law prohibited."

a.   GHOMI initiated and negotiated the first order personally.  On April 26, 2023, GHOMI corresponded with a U.S. Company-1 sales representative under the subject line "3850-24XS" about six Cisco WS-C3850-24XS-E switches.  Over the course of the day, GHOMI requested photographs of the units and their labels, negotiated to buy the six switches off eBay at $3,400 each, including FedEx shipping, and specified that they be sent "to Dubai."  He attributed the target price to an arrangement with his "friend," negotiated different prices if payment would be made by PayPal instead of wire transfer, and confirmed the order.

b.   The next day, GHOMI directed that the invoice be sent to, and payment made by, that same friend.  GHOMI instructed the representative to bill the six switches as new with a one-year warranty and to send the invoice to Co-Conspirator-5's personal email account.  Co-Conspirator-5 submitted a purchase order for the six switches that day from his MBE Trading email account, stating that he would pay the full amount by bank transfer.  On May 1, 2023, GHOMI assured the

39

sales representative that he would have the wire transfer detail the following day.

       c.   U.S. Company-1 invoiced MBE Trading $20,355 on May 3, 2023 for the six WS-C3850-24XS-E switches and shipped them by FedEx to MBE Trading in Dubai.  On May 23, 2023, the sales representative confirmed that the order had shipped to Dubai.  MBE Trading, in turn, invoiced FPR -- identified on the proforma as "Faraz Co" -- for these same six switches on May 3, 2023, adding a "profit net10%" line item and recording delivery "to lenj."[17]  The proforma was marked paid.

       d.   GHOMI and Co-Conspirator-5 then proceeded to a second order for Cisco WS-C3850-24S series switches, which GHOMI had flagged during the April 26 exchange discussed above.  Co-Conspirator-5 submitted MBE Trading's purchase order on April 28, 2023, and U.S. Company-1 invoiced MBE Trading $23,250 on May 15, 2023 for five WS-C3850-24S-E and ten WS-C3850-24S-S switches.  MBE Trading invoiced "Faraz Co" for the same switches -- which it listed as fifteen WS-C3850-24S-S -- by proforma

---

[17] Based on my training and experience and conversations with BIS agents who routinely conduct export-control investigations, I understand "lenj" to refer to a traditional wooden cargo vessel, or dhow, of the kind regularly used to carry goods across the Persian Gulf between ports in the UAE and ports in Iran.  I understand the notations "Delivery to lenj / dubai port" and, on the ship-to line, "Delivery to lenj / dubai mersi port," on the MBE Trading proformas reflect that the goods, after being received by MBE Trading in Dubai, were to be delivered to such a vessel at a Dubai port for onward sea carriage to Iran.  The transport of goods to Iran aboard such vessels, rather than through established container-shipping lines, is a recognized method of moving cargo from the UAE to Iran, and one that may not generate the bills of lading and manifests that conventional ocean carriers create.

dated May 2, 2023, again adding a "profit net10%" line item and recording delivery "to lenj."  The proforma was marked paid.

69.  GHOMI placed a further order with U.S. Company-1 in mid-May 2023, again personally negotiating the order and price. Between May 16 and May 26, 2023, GHOMI ordered a new WS-C3850-24XS-E switch and inquired about additional Cisco routers and modules.  U.S. Company-1's invoice dated May 18, 2023, billed MBE Trading for, among other items, the new WS-C3850-24XS-E switch GHOMI had confirmed.

70.  U.S. Company-1 continued to supply MBE Trading through the remainder of 2023, including a July 2023 invoice for $4,040 for a Cisco WS-C3850-48XS-S switch and an October 2023 invoice for $4,400 for two Cisco Firepower 2130 network security appliances.

71.  Based on the matching part numbers, quantities, and dates; the contemporaneous purchase orders and invoices; GHOMI's personal negotiation and direction of the purchases; and MBE Trading's addition of a markup before invoicing FPR, I believe the Cisco switches U.S. Company-1 shipped to MBE Trading in Dubai were procured at GHOMI's direction for onward delivery to FPR in Iran.

72.  GHOMI also procured Cisco networking equipment from U.S. Company-2 for FPR in the spring of 2023 using similar means.

a.   GHOMI initiated and personally negotiated purchases from U.S. Company-2.  On May 5, 2023, GHOMI emailed the U.S. Company-2 sales representative: "This is Jim from EBay

41

we communicated last week and earlier this week for 10-15 pcs of 3850-24XS."  GHOMI explained that he was buying for his "freind" [sic], who could take up to fifteen WS-C3850-24XS-E switches at a target price of $2,100 each for wire transfer outside of eBay, and stated that GHOMI would "arrange for him to work with you directly to do the transaction."  Over the following days, GHOMI negotiated the quantity, price, and shipping logistics, and asked about additional modules to include in the shipment.

b.    GHOMI introduced Co-Conspirator-6 to the U.S. Company-2 sales representative as his "friend" who wanted to purchase the Cisco switches.  On May 10, 2023, GHOMI gave the sales representative Co-Conspirator-6's email address.  On May 11, 2023, the sales representative wrote to Co-Conspirator-6, referencing his discussions with GHOMI, "As I mentioned to Jim I can do this deal direct," and offered the switches at $2,250 each.  GHOMI checked in with the sales representative on May 14, 2023, asking, "Did all worked out between you and Mohamed on 16 pcs of 24XS??"  On May 15, 2023, Co-Conspirator-6 followed up with the representative, referencing GHOMI's input, expressing interest in U.S. Company-2 as a "regular supplier," and proposing a price of $2,125 each to cover PayPal fees.

c.    The order of Cisco switches was finalized with GHOMI directly.  On May 24, 2023, after a call with GHOMI, the U.S. Company-2 representative quoted him eighteen WS-C3850-24XS-E and two WS-C3850-24XS-S at $2,100 each -- a total wire payment of $42,000 -- and GHOMI confirmed the order, replying that it

42

was "all confirmed" that the purchase order would follow "by tomorrow."

d.    The next day, GHOMI told the representative the purchase order would arrive in "half an hour"; approximately six minutes later, Co-Conspirator-5 emailed the representative attaching "the PO of this deal" and asking that the proforma invoice be sent so he could transfer the total by bank.  U.S. Company-2 issued proforma invoice 23172 the same day, to MBE Trading in Dubai for the twenty Cisco switches at the $2,100 price GHOMI had set, totaling $42,000.  GHOMI told the representative the buyer would wire payment within days and to "arrange all directly with him."

73.  According to a U.S. Company-2 sales order dated May 25, 2023, the equipment was shipped from Minnesota to MBE Trading in Dubai.  A U.S. Company-2 invoice dated June 7, 2023 billed MBE Trading $42,000 for the equipment, and MBE Trading was the originator of the corresponding wire payment to U.S. Company-2.

a.    MBE Trading invoiced "Faraz Co" for the same twenty switches on May 28, 2023, three days after U.S. Company-2's invoice to MBE Trading.  The proforma added a "profit net10%" line item, with delivery "to lenj," and was marked paid.

74.  GHOMI continued to direct the U.S. Company-2 relationship after the first shipment.  Between late May and early June 2023, GHOMI told the representative that the end customer's "project" required forty to forty-six switches, sought additional units, and instructed the representative that,

43

as to those additional units, he should "only communicate with me." U.S. Company-2 issued further proforma invoices to MBE Trading through the remainder of 2023, each naming Co-Conspirator-5 as the contact, including a November 2023 invoice for $18,000 for twenty WS-C3850-24XS-E switches and a November 2023 invoice for $2,400 for three WS-C3850-24XS-E switches.

75. MBE Trading's purchase order to U.S. Company-2 fell in sequence with the purchase orders MBE Trading issued to U.S. Company-1 in the same weeks, indicating that GHOMI's 2023 procurement from the two suppliers was a single, continuous course of conduct. Based on GHOMI's personal initiation and direction of the purchases, the quantity and timing of the purchase orders, and Co-Conspirator-6 and Co-Conspirator-5's roles in supplying FPR, I believe the switches U.S. Company-2 shipped to MBE Trading in Dubai were procured at GHOMI's direction for onward delivery to FPR in Iran.

76. In addition to the purchases from U.S. Company-1 and U.S. Company-2 discussed above, FPR procured large quantities of Cisco networking equipment from MBE Trading from at least July 2019 to May 2024.

a. MBE Trading's statements of account to FPR (under the customer name "Faraz Co") reflect at least 43 paid proforma invoices between September 2022 and February 2024, totaling approximately 4.7 million AED (approximately $1.29 million).

b. Based on my review of more than 30 invoices marked as paid in the statements of account, MBE Trading sold at least 670 Cisco switches, 17 Cisco routers, 8 Cisco Firepower

44

security appliances, and numerous Cisco line cards, network modules, power supplies, and fans to FPR between September 2022 and February 2024.  The paid invoices included the invoices for the Cisco switches GHOMI procured from U.S. Company-1 and U.S. Company-2, discussed above.

c.    MBE Trading's statements of account reflect that FPR paid MBE Trading through a combination of U.S.-dollar payments -- including a $25,000 payment on September 5, 2022 and a $50,000 payment on January 11, 2024 -- and Iranian-toman transfers converted at noted exchange rates and generally routed through named intermediaries.  One payment in the statements is expressly attributed to GHOMI: an October 18, 2022 entry crediting 5,420 AED, bearing the notation "remain paid ghomi euro france," reflecting that GHOMI personally settled a remaining balance through a payment made in euros.

77.  GHOMI saved copies of many of the MBE Trading invoices and statements of account to his personal cloud-based accounts. The invoices reflect MBE Trading's sale of Cisco networking equipment -- principally Cisco Catalyst switches, network modules, and power supplies -- to FPR, consistent with the MBE Trading records described above.  The records from GHOMI's cloud accounts span at least July 2019 to March 2024 and identify the customer variously as "faraz pardaz," "BANAYEE … faraz," and "Faraz Co."  Several bear handwritten notations, including dollar-to-dirham conversions and Iranian-toman calculations. The earliest invoice from 2019 identifies the customer as "faraz pardaz" at FPR's Tehran address, care of Co-Conspirator-1.  The

45

2024 invoices, by contrast, identify the customer as "Faraz Co"
in a Dubai "free zone," and include the "Delivery to lenj /
dubai port" notation described above.

### C.    GHOMI Shipped Large Quantities of Computer Networking Equipment from the UAE to FPR in Iran

78.    Based on my review of e-mails, shipping records,
commercial invoices, and Iranian customs documents, GHOMI and
his co-conspirators shipped large quantities of computer
networking equipment from Jebel Ali, UAE, to Bandar Abbas, Iran,
for delivery to FPR in Iran.  GHOMI personally arranged for and
controlled the shipment of goods to Iran using UAE freight
forwarders, directing the shipment of more than 250,000
kilograms of computer networking equipment to FPR in Iran during
this period.  For example:

a.    On November 10, 2014, GHOMI forwarded an air
waybill to Co-Conspirator-1 for a 954-kilogram shipment of
thirteen packages containing computer network switches and
modules from Dubai, UAE, to Shiraz, Iran, via Mahan Air.  The
air waybill listed FPR as the consignee in Tehran, Iran.

b.    On February 24, 2016, GHOMI wrote to UAE Freight
Forwarder-1 regarding a 27,810-kilogram shipment containing 136
packages of "COMPUTER PARTS," from Jebel Ali to Shiraz via
Bandar Shahid Rajaee:[18]

---

[18] Based on internet research, Bandar Shahid Rajaee
is Iran's largest and most significant commercial port, handling
up to 90% of the country's container trade and over half of its
total trade

> B/L IS CONFIRMED.  THE ONLY QUESTION IS THAT THE FINAL
> DESTINATION IS SHIRAZ VIA TRANSIT.  COULD YOU CHECK TO
> MAKE SURE IT IS CORRECT.  THANKS, JIMMY.

UAE Freight Forwarder-1 replied, "Dear Mr. Jimmy, In reference to our previous shipments , CARGO IN TRANSIT TO SHIRAZ is mentioned as transits clauses in description column."  GHOMI forwarded the surrender bill of lading for the shipment to Co-Conspirator-1 on February 28, 2016.  The bill of lading listed FPR as the consignee and FPR's Iranian national ID number.

c.    On July 11, 2016, GHOMI emailed UAE Freight Forwarder-1 regarding a 33,849-kilogram shipment containing 140 packages of "NETWORKING MODULES AND ACCESSORIES AND CABLES" from Jebel Ali, UAE to Shiraz, Iran, via Bandar Shahid Rajaee, stating:

> COULD YOU ARRANGE CONTAINERS TO BE RELEASED AS PER
> SURRENDER B/L LETTER AND CONFIRMATION.  PLEASE ALSO
> SEND ME COPY OF LETTER OF CONFIRMATION.  THANKS,
> JIMMY.

GHOMI sent the surrender bill of lading for the shipment to Co-Conspirator-1 that same day, who forwarded it to a freight forwarding company in Iran ("Iranian Freight Forwarder-1").

d.    On August 25, 2016, GHOMI forwarded a draft bill of lading for a 7,876-kilogram shipment of 21 packages of computer parts from Jebel Ali, UAE to Bandar Abbas, Iran, to Co-Conspirator-1.  The bill of lading listed FPR as the consignee and FPR's Iranian national ID number.

e.    On November 25, 2016, GHOMI forwarded an email to Co-Conspirator-1 with the subject line "Fw: Shipment for Mr. Jimmy."  The e-mail attached a draft bill of lading for a 7,116-

47

kilogram shipment of 63 packages of computer parts from Jebel Ali, UAE to Bandar Abbas, Iran.  The bill of lading listed FPR as the consignee and FPR's Iranian national ID number.  Three days later, a freight forwarding company in the UAE ("UAE Freight Forwarder-2") sent GHOMI and Co-Conspirator-1 the surrender bill of lading for the shipment.

      f.   On June 8, 2017, GHOMI wrote to UAE Freight Forwarder-2 regarding the bill of lading for a 9,202-kilogram shipment of network switches, routers, and networking accessories from Jebel Ali, UAE, to FPR in Iran, stating in relevant part that the bill of lading should include:

> NETWORK SWITCH / ROUTER PACK QUANTITY= 24 PLTS HS CODE
> : 85176230 WT.: 8,690  KG NETWORKING ACCESSORIES PACK
> QUANTITY =  2 PLT HS CODE: 85177090 WT. :  512 KG
> TOTAL PACK QUANTITY=  26 PALLETS TOTAL WEIGHT:  9,202
> KG THANKS, JIMMY

GHOMI forwarded the draft bill of lading to Co-Conspirator-1 later that day.  The bill of lading listed FPR as the consignee and FPR's Iranian national ID number.  UAE Freight Forwarder-2 sent the surrender bill of lading for the shipment to Co-Conspirator-1 on June 13, 2017.

      g.   On July 8, 2017, GHOMI forwarded to Co-Conspirator-2 the surrender bill of lading for a 29,406-kilogram shipment of "NETWORKING CABLES" and "NETWORKING ACCESSORIES" from Jebel Ali to Shiraz via Bandar Shahid Rajaee.  The bill of lading listed FPR as the consignee and FPR's Iranian national ID number.

h.    On March 14, 2018, GHOMI emailed instructions to UAE Freight Forwarder-2 to prepare a bill of lading for a 39,280-kilogram shipment containing 94 pallets of Nexans network cables and 18 pallets of network accessories from the UAE to FPR in Iran.  On March 14, 2018, GHOMI forwarded the draft bill of lading to Co-Conspirator-1.  The following day, Co-Conspirator-1 forwarded the bill of lading to Iranian Freight Forwarder-1.

i.    On May 16, 2018, GHOMI instructed UAE Freight Forwarder-2 to prepare a 40-foot container 20 pallets of Cisco switches and other networking equipment to FPR in Iran.  GHOMI forwarded a draft bill of lading for the 7,962-kilogram shipment to Co-Conspirator-1 on May 22, 2018.  Two days later, Co-Conspirator-1 sent a commercial invoice, bank letter, and packing list for the shipment to UAE Freight Forwarder-2.  The invoice, dated April 24, 2018, reflected the sale of 995 Cisco network switches and routers to FPR in Iran for €624,105.  The bank letter stated that FPR had already paid the invoice in full.  The packing list listed 20 packages containing 995 pieces, described as "NETWORK SWITCH/ROUTER," weighing 7,962 kilograms.  On June 3, 2018, Co-Conspirator-3 emailed Co-Conspirator-1 a copy of the surrender bill of lading and UAE and Iranian customs documents, as well as the packing list and commercial invoice for the shipment.  The bill of lading also stated, "CARGO IN TRANSIT TO SHIRAZ VIA BANDAR ABBAS," and noted, "SHIPPED ON BOARD, 25-May-2018."

j.    On May 27, 2018, GHOMI emailed UAE Freight Forwarder-2 that he urgently needed a copy of the bill of lading

49

and asked whether UAE Freight Forwarder-2 could deliver it via courier service "to my region" the following day.  In follow-up emails to UAE Freight Forwarder-2 that same day, GHOMI provided FPR's address in Tehran and wrote that the courier who "picked up 12 switches has a [friend who] will go To Tehran tonight," and asked UAE Freight Forwarder-2 to deliver the documents to the courier.  On May 30, 2018, GHOMI forwarded an air waybill from UAE Freight Forwarder-2 to Co-Conspirator-1 for the shipment of a certificate of origin to "JIMMY" at "FARAZ PRADAZ [sic] RAYANEH" in Tehran, Iran.

79.  GHOMI signed packing lists that included Cisco and other U.S.-origin networking equipment in shipments to Iran. For example:

a.   On July 28, 2014, Co-Conspirator-2 sent a bill of lading to a customs clearance facilitator for a 12,810-kilogram shipment from Jebel Ali, UAE, to FPR in Iran.  An accompanying packing list listed Nexans structured cabling, Cisco networking switches, routers, and modules, and Juniper switches, modules, and power supply equipment.  The packing list was signed electronically, "Thanks, Jamshid Ghomi."  On August 3, 2014, Co-Conspirator-4 sent an invoice, packing list, and certificate of origin for the shipment to Iranian Freight Forwarder-1.

b.   On July 13, 2015, Co-Conspirator-3 forwarded to Co-Conspirator-1 an Iran Air air waybill and accompanying packing list for a 727-kilogram shipment from Dubai, UAE, to Shiraz, Iran, for FPR.  The packing list, which included 56

50

Cisco switches, 40 Cisco power supplies, and 146 Cisco modules, was signed electronically, "Thanks, Jamshid Ghomi."

c.    On August 8, 2015, Co-Conspirator-3 forwarded a bill of lading, packing list, and cargo arrival notice to Co-Conspirator-1 for a 16,671-kilogram shipment from Jebel Ali, UAE, to Bandar Abbas, Iran.  The bill of lading listed FPR as the consignee and FPR's Iranian national ID number.  The packing list, which listed Cisco and Extreme Networks switches, as well as Nexans structured cabling, was signed electronically, "Thanks, Jamshid Ghomi."

**D.    GHOMI and FPR Supplied U.S.-Origin Networking Equipment to the Atomic Energy Organization of Iran and Affiliated Entities**

80.  AEOI is the Iranian government agency principally responsible for Iran's nuclear research and development, including its centrifuge and experimental laser uranium-enrichment programs.  AEOI is subject to U.S. sanctions.  On June 28, 2005, President George W. Bush designated AEOI as an SDN in the Annex to Executive Order 13382, which targets proliferators of weapons of mass destruction and their supporters.  OFAC designated AEOI as an SDN on November 5, 2018, under Executive Order 13599 for having operational and regulatory control over Iran's nuclear program and responsibility for nuclear research and development.  On January 30, 2020, the U.S. Department of State designated AEOI pursuant to Executive Order 13382 for playing a leading role in Iran's nonperformance of its key nuclear commitments, including

exceeding the limits on its uranium stockpile and enrichment levels.

81.  As set forth below, from at least 2017 through 2023, FPR sold U.S.-origin Cisco networking equipment and Nexans structured cabling to AEOI, its nuclear-fuel subsidiary, and the company that provides repairs and support for Iran's only operating nuclear power plant.  As a U.S. person, GHOMI was prohibited from engaging in or facilitating any business with AEOI.  FPR nonetheless pursued and conducted business with the Iranian government's nuclear agency.  Emails, proforma invoices, corporate ledgers, and audited financial statements reflect a sustained commercial relationship in which FPR solicited orders from AEOI, quoted and supplied Cisco networking equipment and other products to AEOI, and received payments from AEOI.

82.  In mid-2021, AEOI required FPR to register as an approved vendor and, over the following months, to supplement and update its registration and ownership documentation.  The registration process required FPR to submit GHOMI's and his wife's Iranian identification documents and photographs to confirm FPR's ownership.

a.  On May 9, 2021, an AEOI employee sent Co-Conspirator-2 an email with the subject line, "Contractors Form," attaching AEOI's vendor-registration form and asking FPR to complete and return it with supporting corporate documents.

b.  On June 7, 2021, Co-Conspirator-2 sent AEOI the completed contractor form and supporting documentation, including GHOMI's Iranian National ID card and a passport-style

photograph of GHOMI.  The contractor form listed FPR's company name and identified GHOMI as FPR's "Managing Director" and "Chairman of the Board of Directors."  In response to the question -- "Has this contractor previously cooperated with the country's military and defense sectors?" -- FPR answered "Yes." FPR's cover letter described the attachments as "the official documents of the company."

c.    AEOI continued to require updated vendor registration documentation.  On October 13, 2021, an AEOI employee asked FPR to complete an updated vendor form.  In response to AEOI's requests for documentation of FPR's ownership, Co-Conspirator-2 emailed GHOMI's Iranian birth certificate on January 22, 2022, and, on February 6, 2022, GHOMI's wife's Iranian identification documents, including her photograph and birth certificate.

d.    In January 2022, FPR submitted two further AEOI contractor forms -- a completed form on the same template FPR had used in June 2021, and an updated, longer version executed under FPR's company seal.  On each, in response to the same question concerning prior cooperation with Iran's military and defense sectors, FPR answered "No."  On the June 2021 form, FPR had answered "Yes" to that question.

83.  FPR's pursuit of AEOI's business began at least as early as 2017.  FPR's general journal records at least five sale invoices to AEOI between July and August 2017.  FPR's dealings with AEOI were formalized by contract.  In October 2017, FPR posted a performance bond at Bank Melli guaranteeing its "good

performance of obligations" in connection with its sale to AEOI of "switches and modules."  FPR's bank ledger reflects more than 4 billion rials in payments from AEOI from September to December 2017.

84.  FPR's dealings with AEOI did not end with the 2017 sales described above.  Beginning in July 2018, FPR solicited further business from AEOI.  On July 14, 2018, Co-Conspirator-2 sent an AEOI representative a price list for Cisco switches.  On September 22, 2018, AEOI's Directorate General of Information and Communications Technology emailed FPR that AEOI had decided to purchase two Cisco 4000 Series Integrated Services routers and asked FPR to send an official proforma invoice.  The next day, Co-Conspirator-2 replied, attaching FPR's proforma.  The proforma named AEOI as the customer, bore FPR's company seal, and quoted the two routers, free installation by FPR, and several Cisco software licenses, including a "CISCO U.S. Export Restriction Compliance License."  It stated that the goods would be "Original (with CISCO hologram)."  In the weeks that followed, Co-Conspirator-2 sent AEOI a revised proforma and further materials marketing FPR's available Cisco, Nexans, and Extreme Networks products.

85.  FPR's bank records reflect a payment from AEOI of 3.1 billion rials in April 2018, and three further payments totaling 1.1 billion rials between November and December 2018.  The performance bond FPR had posted in connection with its 2017 AEOI contract was released in January 2019.

54

86. Beginning in late 2018, FPR also began soliciting business from AEOI's nuclear-fuel subsidiaries. Between November 2018 and January 2019, FPR prepared at least four proforma invoices, offering Nexans-brand structured cabling to AEOI subsidiaries, including an entity I believe to be the Nuclear Fuel Production and Procurement Company ("NFPC"). Co-Conspirator-2, an FPR sales manager, transmitted the proforma invoices to an AEOI employee in January 2019, along with a July 2018 letter from Nexans Cabling Solutions reflecting that FPR was a certified Nexans distributor in Iran. At least one of the solicitations resulted in a completed sale. On January 30, 2019, Co-Conspirator-2 sent a proforma invoice for 2.17 billion rials of Nexans structured cabling to NFPC, and on February 7, 2019, FPR received a check deposit in that exact amount from NFPC.

87. FPR's relationship with AEOI continued, resulting in a further sale totaling 397 million rials to AEOI in December 2019. By 2022, FPR, by then a registered vendor, was offering U.S.-origin data-storage equipment to AEOI. For example, an April 2022 proforma invoice offered to sell Hewlett Packard hardware to AEOI for more than 4.3 billion rials. FPR's records do not reflect whether that proforma resulted in a sale.

88. FPR's sales to AEOI-affiliated entities continued into 2023 and 2024. FPR's sales and accounting records reflect two sales in 2023 to NPPD. FPR's ledgers reflect a sale of approximately 974 million rials on January 2, 2023, and a sale of 7.7 billion rials on February 20, 2023. FPR carried an

55

unpaid balance of 7.7 billion rials as a receivable in its audited financial statements and, in April 2023, sent NPPD a letter demanding payment.

89.  Also in late 2023, FPR sold Cisco-brand networking equipment to an AEOI-affiliated entity, the Nuclear Power Plants Repairs and Support Company ("TPNA"), associated with Iran's only operating nuclear power plant (the Bushehr nuclear power plant).  FPR's sales ledger reflects a sale to TPNA on November 7, 2023, for 3.9 billion rials that included six Cisco Catalyst switches, and a second sale on December 19, 2023 of fifteen Cisco transceiver modules for 97 million rials.  FPR's proforma invoices for these two sales reflect the same items and amounts.

90.  From December 2023 to early 2024, FPR prepared proforma invoices offering Cisco ISR-series routers to AEOI and an affiliated research institute; FortiGate-400F firewalls and a Fluke network tester to the Bushehr Atomic Power Plant Operating Company, an entity I believe to be the operator of Iran's only operating nuclear power plant; and Cisco Catalyst switches to AEOI.  These proformas reflect FPR's offers to sell the listed U.S.-origin equipment to AEOI entities; the records before me do not establish whether each offer resulted in a completed sale.

**E.    GHOMI and FPR Supplied U.S.-Origin Networking Equipment to MODAFL and Affiliated Entities**

91.  According to my review of FPR's business records -- including its sales and bank ledgers, periodic sales reports, and proforma invoices -- FPR operated as a procurement conduit supplying U.S.-origin Cisco networking, security, and encryption

equipment to a cluster of entities owned by, controlled by, or affiliated with MODAFL from at least 2014 to 2022.  MODAFL is Iran's defense ministry and is responsible, among other things, for supervising Iran's development and production of missiles, weapons, and military aerial equipment.[19]

92.  FPR's military customers included MODAFL itself, the Joint Staff of the Army, IEI, and IEI affiliates ISIRAN, Iran Computer Industries Co. ("ICI"),[20] and Sairan Information Exchange Space Security Industry ("SAAFTA").[21]  According to

---

[19] The U.S. Department of State designated MODAFL as a proliferator of weapons of mass destruction on October 25, 2007, pursuant to Executive Order 13382.  OFAC designated MODAFL on March 26, 2019, as an SDN pursuant to Executive Order 13224 for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Iran's Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF").

[20] Based on my review of FPR's business records, I believe that ICI is affiliated with MODAFL. A July 2017 contract between FPR and ICI expressly identified the company as affiliated with ISIRAN and MODAFL.  In addition, Iran Computer Industries appears in FPR's customer database together with other IEI entities, including ISIRAN and SAAFTA, reflecting that FPR identified Iran Computer Industries as part of the IEI corporate family.  In addition, a long-running dispute between January 2018 and March 2020 regarding payment for a Cisco Nexus 5500 license shows that ICI and ISIRAN operated in an integrated fashion.  The transaction was requested in May 2016 by ISIRAN's Commercial Deputy; the resulting $4,200 invoice was to be paid by ICI; and the equipment was destined for delivery to the Geographic Organization of the Armed Forces.  When ICI did not pay, FPR sought payment from ISIRAN's then-Managing Director. FPR's customer database also catalogs at least two individuals holding managerial roles in both ISIRAN and ICI.

[21] SAAFTA itself is not an SDN.  According to SAAFTA's Notice of Incorporation published in Iran's Official Gazette in January 2015, however, SAAFTA's initial board of directors consisted entirely of representatives from IEI, ISIRAN, and Iran Communications Industries.  SAAFTA's auditor was listed as the "Auditing Institute of MODAFL."  In addition, SAAFTA's website (saafta.ir) was hosted by ISIRAN, and SAAFTA shared the same physical address as IEI.

OFAC, IEI offers "a diversified range of military products including electro-optics and lasers, communication equipment, telecommunication security equipment, electronic warfare equipment, new and refurbished radar tubes, and missile launchers."  ISIRAN "is one of the largest and most experienced information technology companies in Iran" and is owned or controlled by IEI.  MODAFL, the IEI, and ISIRAN are SDNs.[22]

93.  Based on my review of FPR's records, FPR solicited business from MODAFL-affiliated entities, recorded sales in its ledgers and sales reports, and received payments.  From 2014 to 2017, for example, FPR's dealings with MODAFL-affiliated entities included the following:

a.   On or about April 15, 2014, Co-Conspirator-2 told Co-Conspirator-3 to issue a proforma invoice to the Joint Staff of the Army.  The same day, FPR issued a proforma invoice to the Joint Staff of the Army for Nexans structured network cabling totaling approximately 140 million rials.  The fax number on that proforma matches the contact information FPR recorded for the Joint Staff of the Army in the customer database described below.

b.   FPR also issued proforma invoices for Cisco equipment to ISIRAN and to the Iziran Institute, an IEI educational subsidiary.[23]  Between May 2014 and July 2015, FPR

_____

[22] OFAC designated IEI on September 17, 2008, for being owned or controlled by MODAFL, and ISIRAN on July 12, 2012, for being owned or controlled by IEI.

[23] The proforma invoices are addressed to Iziran (ایزایران) and Iziran Institute (انستیتو ایزایران).  Based on my review of these

issued at least three such proforma invoices, quoting Cisco networking and network-security equipment -- including firewalls, router security licenses, switches, and encryption software -- in amounts totaling more than 1.9 billion rials.

c.  FPR's records reflect completed sales to these entities in 2014 and again in 2016 and 2017.[24]  In 2014, those transactions included seven sales totaling 750 million rials to IEI, two sales totaling 246 million rials to ICI, a 65-million-rial sale to the Iziran Institute, and three sales totaling 51 million rials to the Joint Staff of the Army.  In 2016 and 2017, FPR had at least 19 sales totaling more than 4 billion rials to ICI, sales totaling approximately 240 million rials to IEI, and five sales totaling more than 600 million rials in which MODAFL itself is named as the customer.

94.  On or about June 17, 2017 [1396/03/27], FPR entered into a contract (in Farsi) with ICI.  The contract provided that FPR would supply more than 3.7 billion rials of Cisco networking equipment to ICI.

---

proforma invoices, FPR's customer database, and other records, I believe that the "Iziran" invoices refer to ISIRAN, an OFAC-sanctioned entity.  ISIRAN is commonly known in Farsi as "ایزایران."  A contract between FPR and ICI, discussed below, reflects that "Iziran" is affiliated with MODAFL.  In addition, in its customer database FPR listed these entities within a cluster of IEI entities, including IEI/SAIRAN, SAAFTA, and Iran Computer Industries together, reflecting that FPR treated these names as part of the IEI corporate family.  The Iziran Institute, while sharing a similar name, is a separate IEI subsidiary; based on publicly available information, it is the primary educational and training subsidiary of IEI, which operates under MODAFL's control and maintains a special partnership to deliver educational services to members of the IRGC.

[24] During my review, I was unable to locate sales records corresponding to Persian year 1394 (March 2015 to March 2016).

a.    GHOMI signed the contract on FPR's behalf to the left of FPR's company seal (registration no. 135893), immediately above the printed text in Farsi: "Faraz Pardaz Rayaneh Co. — Name: Jamshid Ghomi — Position: board member, chairman of the board of directors, and managing director."  The body of the contract also identified GHOMI as FPR's representative and stated that GHOMI was authorized to sign the contract pursuant to FPR's July 2008 notice in the Iranian Official Gazette.

b.    The contract described ICI as affiliated with MODAFL.  Specifically, Article 1 of the contract identified the buyer as "Iran Computer Industries Co. (affiliated with ISIRAN Co. and MODAFL)."  The signature page bears a corporate seal reading "Ministry of Defense and Armed Forces Logistics — Iran Computer Industries" and was signed by ICI's managing director and finance deputy.

c.    FPR agreed in the contract to supply ICI with forty-one Cisco Catalyst switches, one network module, and 318 Cisco transceivers.  The contract further specified that the equipment had to be original, with all required licenses.  Based on Cisco's Public Export Product Data tool, the switches were controlled on the Commerce Control List under ECCNs 5A002.a.2 and 5A991.c.

d.    The contract expressly excludes economic sanctions from force-majeure treatment, stating in pertinent part that "economic sanctions . . . shall not be considered

60

instances of force majeure," thereby allocating the risk of economic sanctions to FPR as the seller.

e.   FPR's general journal for the Persian year 1396 (March 2017 to March 2018) reflects a sale to ICI of more than 3.7 billion rials.

95.   FPR's records reflect that its dealings with MODAFL-affiliated entities continued and expanded after the 2017 contract, and that FPR received payment for the equipment it supplied.  ICI was FPR's largest MODAFL-affiliated customer.

a.   From March 2017 to March 2018, FPR's general journal reflects sales to ICI totaling more than 14 billion rials -- including the 3.7-billion-rial sale described above -- and payments received from ICI during that period totaling more than 10 billion rials.

b.   In 2018, FPR recorded further sales to ICI exceeding 3 billion rials and received payments from ICI exceeding 7 billion rials.  In 2019, FPR's sales ledger records further sales to ICI of more than 2.7 billion rials; these included a sale of ten Cisco Catalyst 3850 switches and twenty Cisco SFP transceiver modules for over 2.1 billion rials.

c.   FPR received payments from ICI exceeding 12 billion rials from late 2020 to early 2021.  Bank ledgers reflect that in early 2021 FPR posted a performance guarantee in connection with a further contract to supply network switches to ICI.

96.   In December 2019, ICI solicited export-controlled U.S.-origin Cisco encryption technology from FPR directly.  On

61

December 14, 2019, an ICI employee asked Co-Conspirator-2 to provide a price quote for a Cisco FL-39E-HSEC-K9 License for a Cisco router.  That same day, Co-Conspirator-2 sent ICI a proforma invoice quoting four such licenses for 215 million rials and describing the item as a "CISCO U.S. Export Restriction Compliance license for 3900E series ( FL-39E-HSEC-K9 )."  Two days later, on December 16, 2019, the ICI employee responded: "Please mention in Performa invoice that this licenses are compatible with Cisco router 3945 and they will remove IP sec tunnel limitation."  The FL-39E-HSEC-K9 is a Cisco High Security ("HSEC") feature license that enables IPsec encryption functionality otherwise restricted on Cisco 3900-series routers.  According to Cisco's public export compliance tool, the license is controlled for export from the United States under ECCN 5D002.b.

97.  FPR's records reflect further sales to, and payments from, the other MODAFL-affiliated entities over the same period.

a.  On July 18, 2017, FPR recorded a 1.495-billion-rial sale to IEI (entered in the journal as SAIRAN).  On October 28, 2017, FPR recorded a 499-million-rial sale to the Joint Staff of the Army, followed by a further 33-million-rial sale to the Joint Staff on February 4, 2018.  FPR's journal reflects matching check payments from the Joint Staff within a few days of each of the two sales.

b.  In 2017, FPR recorded a sale to SAAFTA of 324 million rials; and that year FPR received payments of more than 1.5 billion rials from IEI, more than 580 million rials from the

62

Joint Staff of the Army, and approximately 352 million rials
from SAAFTA.

       c.   In 2019, FPR recorded three sales to SAAFTA
totaling approximately 319 million rials.  In 2020, FPR received
further payments from these entities, including approximately
490 million rials from ISIRAN and approximately 157 million
rials from IEI.  In late 2022, FPR recorded five additional
sales to SAAFTA totaling more than 712 million rials.

      **F.**    **International Money Laundering**

    98.  As set forth above, beginning by at least 2009 and
continuing through the present, GHOMI conspired with others to
procure U.S.-origin networking equipment for FPR's Iranian
customers, in violation of IEEPA and the ITSR.  Those customers
included Iranian government ministries and agencies, state-
sector and strategic enterprises, public universities, and
private companies, including many OFAC-sanctioned entities.

    99.  FPR's sales to those customers generated revenues
deposited into FPR's Iranian bank accounts.  Based on my review
of FPR's internal bank ledgers, the deposits into FPR's
principal operating account ("Bank Melli 8003") consisted
overwhelmingly of payments from FPR's Iranian customers.  FPR's
own records reflect how GHOMI moved those proceeds to himself in
the United States.  FPR used funds in Bank Melli 8003 to
purchase U.S. dollars -- recording each purchase on its ledger
as a "purchase of [amount] dollars to America" -- and within
days GHOMI received a wire in the same dollar amount referenced
in the Bank Melli 8003 ledger into one of his U.S. bank

63

accounts.  The wires did not come directly from FPR.  They were sent by a rotating set of third-country trading companies and exchange houses with no apparent connection to FPR or to GHOMI, and carried descriptions disguising their source -- commercial pretexts such as "Buying Goods" and "For Consulting Fees," and, in other instances, references to GHOMI's late father's estate. GHOMI reported the wires to the IRS as gifts from a non-resident alien or foreign estate.  The dollar-for-dollar correspondence between FPR's purchases in the Bank Melli 8003 ledger and GHOMI's receipts -- days apart and routed through unrelated intermediaries -- reflects that the funds were FPR's Iranian sales proceeds, not an inheritance.

100. To carry out these transfers, GHOMI typically directed Co-Conspirator-1, an FPR employee, to contact a money mover and request the wire.  The money mover originated the wire through a trading company or exchange house in a foreign jurisdiction -- such as the BVI, Hong Kong, Kuwait, Malaysia, Taiwan, Turkey, or the UAE -- and Co-Conspirator-1 relayed the confirmation to GHOMI or to the recipient.  Interposing an entity with no apparent connection to the transaction concealed that the funds originated from FPR.

101. Between 2011 and 2024, GHOMI moved more than $15 million from Iran into his U.S. bank accounts and a construction escrow account held by GHOMI's contractor on his behalf (the "Escrow Account").

102. Based on the evidence set forth below, I believe that these transfers into the United States likely constitute

64

international concealment money laundering.  Each transfer of FPR's Iranian sales proceeds into the United States, routed through unrelated third-country trading companies and exchange houses with false commercial and estate-related descriptions, concealed the nature, source, and ownership of the proceeds.  I also believe that to the extent FPR's payments to its foreign suppliers were made in U.S. dollars that cleared through U.S. correspondent banks, those transfers also passed through the United States and likely constitute international promotional money laundering.

### 1.   GHOMI's Control of FPR's Funds

103. GHOMI treated FPR's funds as his own. For example, on January 14, 2019, FPR sent a letter on its letterhead -- bearing FPR's stamp and registration number 135893 -- to an FPR customer, directing that the customer deposit the remaining amount from an FPR invoice into GHOMI's personal Bank Melli account ending in 6004.  That direction to a customer was not an isolated instance.  According to FPR's bank ledgers for years 1396, 1397, and 1399, FPR's Bank Melli 8003 account made at least 112 transfers, totaling at least 241.6 billion rials, to GHOMI's Bank Melli 6004 account, with only approximately 4.77 billion rials returning.  These transfers reflect GHOMI's ownership and control of FPR's funds and his use of FPR's accounts as a personal source of money, sweeping FPR's revenues into his own personal account.

2.    Transfers to FPR's Foreign Suppliers

104. GHOMI used funds from FPR's operating account, Bank Melli 8003, to pay FPR's foreign suppliers.  FPR's bank ledgers for Persian years 1396 and 1397 (March 2017 to March 2019) reflect more than 20 checks drawn on Bank Melli 8003 to purchase U.S. dollars, euros, and UAE dirhams for transmission to FPR's suppliers and intermediaries in Hong Kong, Dubai, Germany, and Belgium, totaling approximately 50 billion rials.[25]  For example:

a.    On January 5, 2016, GHOMI emailed Foreign Reseller-1 to arrange a $32,500 payment for the purchase of Cisco products for shipment to UAE Freight Forwarder-1.  GHOMI wrote that he had "HAD A ISSUE WITH COMMERZ BANK TRANSFER FROM DUBAI" and asked for alternate bank details "SO I CAN WIRE THE $32500 TODAY."  GHOMI forwarded the new bank account information and payment amount he received from Foreign Reseller-1 to Co-Conspirator-1.  Later that same day, Co-Conspirator-1 forwarded GHOMI confirmation of the $32,500 payment, with the information regarding the originator of the payment redacted.

b.    On March 17, 2018, GHOMI emailed Co-Conspirator-1, with the subject line "$175K wire" and the following statement for Co-Conspirator-1 to send to Foreign Reseller-1: "This is the wire detail for $175K.  Jimmy will follow up later. Thanks."  GHOMI also provided the email address of Foreign Reseller-1 in the email to Co-Conspirator-1.  The next day, Co-Conspirator-1 forwarded confirmation of a $175,000 wire transfer

---

[25] The Persian years 1396, 1397, and 1399 correspond to March 2017 to March 2018, March 2018 to March 2019, and March 2020 to March 2021, respectively.

to Foreign Reseller-1 from a bank in Hong Kong, using the verbatim text GHOMI had provided.  The wire transfer message referenced two Flexinet invoices.  That same day, FPR's bank ledger reflects that the wire transfer was funded with an 8.45 billion rial check from Bank Melli 8003 for the "purchase of $175,000 to Hong Kong."

   c. On July 26, 2017, Co-Conspirator-1 emailed GHOMI a copy of a receipt for a $116,300 wire transfer sent the previous day from a trading company to Foreign Reseller-1's account in Hong Kong -- a vendor used by GHOMI and FPR to procure networking equipment.  The wire transfer message referenced a Flexinet invoice.  FPR's bank ledger reflects that the transfer was funded on July 25, 2017, with a 4.44 billion rial check from Bank Melli 8003 for the "purchase of $116,300 to Hong Kong."

   d. FPR's bank ledger reflects that, on March 10, 2018, a check for 4.51 billion rials was drawn on Bank Melli 8003 to purchase 228,000 UAE dirhams "to Dubai for [Co-Conspirator-6]," together with a further 120,000 UAE dirhams to Dubai.  A separate FPR accounting entry identifies the latter as a purchase of "AED 120,000 to Dubai" for UAE Freight Forwarder-2, which GHOMI used to ship goods to FPR in Iran.

   3. <u>Transfers to GHOMI in the United States</u>

 105. GHOMI transferred funds from FPR's Bank Melli 8003 account to his U.S. bank accounts.  To effectuate many of these transfers, FPR drew funds from Bank Melli 8003 to acquire U.S. dollars, recording each as "purchase of [amount] dollars to

America" in the Bank Melli 8003 ledger.  Within days, GHOMI received a wire in the same amount -- in some instances reduced by a small transfer fee -- from a company or exchange house in a third country into one of his U.S. accounts.  The messages accompanying the transfers included descriptions such as "FROM ESTATE OF JAVAD GHOMI," "Buying Goods," "For Consulting Fees," "Spare Parts Injector RFB BPCT2," "For Building Material," "For Buying Equipment," "FOR INVESTMENTS," and similar pretexts. This transfer mechanism concealed that the funds were derived from FPR and GHOMI's illegal Iranian business.[26]

106. The following ledger entries and incoming wires are illustrative of the transfer of funds originating from FPR's Bank Melli 8003 account to GHOMI's accounts in the United States.

a.   On October 9, 2016, GHOMI sent Co-Conspirator-1 instructions to send funds to GHOMI's Wells Fargo 8108 account, directing Co-Conspirator-1 to use the beneficiary message "FATHERS ESTATE."  Two days later, GHOMI's Wells Fargo 8108 account received a transfer of $29,971 from a Kuwaiti exchange house.

b.   On May 28, 2017, FPR's bank ledger recorded a debit of 1.14 billion rials described as "purchase $50,000 to America."  Two days later, GHOMI's Bank of America 1539 account

---

[26] Based on my training and experience and on my conversations with other agents, money derived from Iran is routinely sent to the United States via foreign trading companies and money-exchange businesses located in third-party countries because direct transfers from Iran are precluded by U.S. sanctions and by U.S. financial-institution screening.

received a $50,000 wire from a trading company in Turkey, with no beneficiary message.

c.    On March 10, 2018, FPR's bank ledger recorded a debit of 1.47 billion rials to "purchase $50,000 to America." On March 12, 2018, GHOMI's Bank of America account received $49,965 from a Kuwaiti money-exchange business, bearing the beneficiary instruction "CAPITAL TRANSFER PERSONAL."

d.    On June 26, 2018, FPR's bank ledger recorded a debit of 2.15 billion rials described as "purchase $25,000 to America."  Several days later, on June 29, 2018, GHOMI's Bank of America account received a $24,880 wire from a trading company in Turkey, with the message "BUYING GOODS."

e.    On February 12, 2019, FPR's bank ledger recorded a debit of 6.21 billion rials to purchase "$50,000 to America." On February 21, 2019, GHOMI's Bank of America account received $49,945 from a UAE trading company, with the stated purpose "FOR INVESTMENT."

f.    On August 11, 2020, FPR's bank ledger recorded four debits for checks payable to a money exchanger, at the stated rate of 229,000 rials per dollar, to fund the purchase of $45,000 remittance to America (approximately 10.3 billion rials) together with a separate $50,000 in cash.  Two days later, GHOMI's Citibank account received a $45,000 wire from a trading company in Kuala Lumpur, Malaysia.

4.   GHOMI's Misrepresentation of Transfers from FPR as Foreign Inheritance

107. Based on GHOMI's federal income tax returns, GHOMI and his wife filed joint federal income tax returns for each tax year from 2011 through 2024.  The most income GHOMI reported in any of those years was $20,684 in W-2 wages in 2011.  From 2015 through 2024, GHOMI reported no more than $250 in interest income and $5,200 in "Other Income" in any year.  GHOMI claimed the Earned Income Tax Credit for tax years 2011, 2013, 2014, 2016, 2017, 2018, and 2019.  During that same 2011 to 2024 period, GHOMI reported more than $1,700,000 in home-mortgage interest and $1,250,000 in state and local real-estate taxes on his federal income tax returns.

108. From 2011 to 2024, GHOMI received more than $15 million in wired funds from foreign individuals or entities -- mostly foreign trading companies located in the BVI, China, Kuwait, Malaysia, New Zealand, Taiwan, Turkey, and UAE -- into GHOMI's bank accounts and the construction account held for his benefit.  In emails to his tax preparers, GHOMI characterized the foreign wires he received as distributions from his late father's estate.  For each year from 2011 to 2024, except 2021, GHOMI filed an IRS Form 3520, "Annual Return to Report Transactions with Foreign Trusts and Receipt of Certain Foreign Gifts."  On the Forms 3520, GHOMI reported a total of approximately $9.4 million in gifts from non-resident aliens or foreign estates from 2011 to 2024.

109. GHOMI's father, Javad Ghomi, is deceased and left an estate, and GHOMI was one of five heirs -- the others being his

70

mother and his three siblings.  The estate's structure and assets, however, are inconsistent with the wires GHOMI received and reported as estate distributions.  The estate's principal asset was real property on Fereshteh Street in Tehran, held jointly and undivided among the five heirs and developed under a construction-partnership contract.  As late as 2016, that property remained under construction and undivided, disposable only by the unanimous consent of all five heirs.  Property in that posture was not yielding distributable proceeds, and any disposition would have run to all five heirs, not to GHOMI alone.  The estate's other assets appear to be modest -- including an income-producing bazaar shop whose rental income, the records reflect, was collected among individuals in Iran and neither paid to GHOMI nor routed through FPR.  The estate the records describe -- undivided, still under development, modest in its remaining assets, and shared among five heirs -- does not account for the approximately $15 million in U.S.-dollar wires GHOMI received from foreign trading companies between 2011 and 2024.

110. Based on my review of FPR's ledgers, wire transfer records, and GHOMI's U.S. bank records, many of the wires GHOMI characterized as estate distributions did not come from his father's estate.  Rather, many of the wires matched, dollar-for-dollar and within days, FPR's purchases of U.S. dollars from its operating account, Bank Melli 8003, using funds generated by FPR's Iranian sales, not estate assets, and were arranged or confirmed by FPR employees, including Co-Conspirator-1 and Co-

71

Conspirator-2.  The messages accompanying many of the wire transfers also were inconsistent with GHOMI's federal income tax characterization of the wires on Forms 3520 as gifts or inheritance from a foreign estate.  Although some of the wires referenced his father's estate, other wires were described in the beneficiary instructions as commercial in nature, such as "Buying Goods," "For Consulting Fees," "Spare Parts Injector RFB BPCT2," "For Building Material," "For Buying Equipment," "For Cost of Services," "For PI No 15210," and "Import of Electronic//Components."

111. The wires GHOMI reported to the IRS on Forms 3520 as gifts from non-resident aliens or foreign estates included, as set forth above, many that were in fact FPR's Iranian sales proceeds.  In reporting those proceeds to the IRS as foreign gifts, GHOMI made the same false inheritance representation he had made to his tax preparers.  Moreover, even presuming that the money wired to GHOMI between 2011 and 2024 reflected genuine foreign gifts rather than illicit proceeds, GHOMI reported only $9,482,851 in foreign gifts on his Forms 3520 of the more than $15 million he received during this period, understating his reportable foreign gifts by approximately $6.1 million.

     5.   <u>The SUBJECT PREMISES Was Constructed with Proceeds of the Conspiracy</u>

112. According to property records, GHOMI purchased a vacant piece of land at 31 High Water, Newport Coast, California -- <u>i.e.,</u> the SUBJECT PREMISES -- on March 25, 2010, for

$4,490,000. Financial records reflect that GHOMI obtained a $3,500,000 construction loan to develop the parcel.

113. A letter on December 17, 2014, from GHOMI's construction company to Farmers & Merchants Bank attached a payments schedule reflecting payments of approximately $10,490,371 toward the construction of the SUBJECT PREMISES between September 2010 and November 2013.

114. The funds GHOMI used to construct the SUBJECT PREMISES were derived in substantial part from foreign-wire transfers into the Escrow Account. Between May 11, 2011 and August 6, 2015, foreign-source wires totaling $7,031,791 were sent on GHOMI's behalf into the Escrow Account. Individual wire amounts ranged from approximately $14,972 to $499,964.

115. There is probable cause to believe that the SUBJECT PREMISES was built with proceeds of GHOMI's sanctions-evasion conspiracy, routed from Iran through third-country trading companies and exchange houses into the Escrow Account.

a. GHOMI founded and controlled FPR, whose business -- the unlawful procurement of U.S.-origin equipment for Iranian customers -- generated revenues far exceeding the $7.03 million that largely funded the Escrow Account. As set forth in Section V.A, for example, the Nexans distributorship agreement represented that FPR had gross revenues of approximately €30 million -- roughly $33 to $38 million -- for the three years preceding June 2016. GHOMI and FPR's unlawful procurement operations were active throughout the construction period. As set forth in Section V.B, GHOMI used his eBay and PayPal

73

accounts to purchase Cisco, Juniper, Extreme Networks, and similar equipment for shipment or transshipment to intermediaries in the UAE, including more than 400 such purchases between 2011 and 2015.

b.    The foreign wires into the Escrow Account originated from a variety of foreign trading companies and exchange houses, several of which also originated wires to pay FPR's suppliers.  For example, the BVI entity Dar Chung International Co. Ltd. sent $50,000 to Nexans on FPR's behalf on January 16, 2014, and sent $100,000 to the Escrow Account on February 25, 2014.

c.    As with the wires into GHOMI's personal accounts described above, the descriptions on the escrow wires were frequently inconsistent with a foreign inheritance.  Of the foreign-source wires into the Escrow Account, 16 transfers totaling approximately $2.05 million referenced GHOMI's father's estate, while 45 transfers totaling approximately $4.97 million bore no beneficiary message or carried commercial descriptions such as "For Building Material," "Payment for Investment in Real Estate," "For Buying Equipment," "For PI No 15210," and "Import of Electronic//Components."

d.    And as with the wires into GHOMI's personal accounts, FPR employees handled the transfers into the Escrow Account.  On at least three occasions in 2014, Co-Conspirator-2 forwarded wire transfer confirmations to GHOMI that she had received from Co-Conspirator-1.  Those confirmations included a $99,960 transfer on February 12, 2014, from Gainful Universal

74

Foods Limited, with the beneficiary message "For Ghomi Property

Form [sic] Fathers Estate"; a $100,000 transfer on February 25,

2014, from Dar Chung International Co., Ltd., with the

beneficiary message "For Ghomi Property Form [sic] Fathers

Estate"; and a $100,000 transfer on May 30, 2014, from Optimal

Limited, with the beneficiary message "Cost of Services for PI

No 101401."  For the reasons set forth above, the handling of

these transfers by FPR employees is inconsistent with the funds

being a personal inheritance.

G.    **GHOMI Knew the Conduct Was Illegal**

116. As set forth below, GHOMI, a United States citizen,

knew that procuring U.S.-origin electronics for FPR in Iran was

illegal.  GHOMI directed his UAE-based co-conspirators to omit

his name from shipping documents, to omit invoices from

shipments bound for Iran, and on at least one occasion to

physically conceal U.S.-origin Cisco equipment inside a larger

shipment to Iran of structured cabling.  GHOMI used front

companies in the UAE to obscure his own role in the procurement

scheme.  And GHOMI personally received warnings, including

warnings printed on the U.S.-origin software licenses he was

procuring for FPR, that U.S. law prohibited the export of those

goods to Iran.

1.    GHOMI and His Co-Conspirators Concealed GHOMI's
      Role, the Contents of the Shipments, and the
      Destination of the Shipments

117. On January 4, 2016, GHOMI emailed an employee of UAE

Freight Forwarder-1:

> WE HAVE GIVEN YOUR INFORMATION TO MAKE ARRANGEMENT.
> SHIPMENT IS UNDER FLEXINET L.L.C . . ., PLEASE ONCE
> THEY CALL MAKE THE ARRANGEMENT SO THEY CAN CLEAR AND
> DELIVER TO [UAE FREIGHT FORWARDER-1].  **PLEASE DO NOT
> BRING UP MY NAME AND FOLLOW UP ONLY UNDER FLEXINET
> L.L.C.**"

(emphasis in original).

118. GHOMI arranged the procurement of Cisco equipment from suppliers in the UAE while obscuring any reference to GHOMI's name.  For example:

a.    On January 20, 2016, an employee of Foreign Reseller-2 emailed GHOMI and UAE Freight Forwarder-1 as follows:

> Below shipment will be delivered by [a Cisco
> distributor].  This will be under name of Horizon
> afghanistan and **this is for Mr Jimmy**.  Please confirm
> once recd.  Note- please make sure not to give any ref
> of [Foreign Reseller-2] or Mr Jimmy.

(emphasis in original).  After UAE Freight Forwarder-1 replied, "Below mail well noted," GHOMI responded, "THANK YOU. . . . JIMMY."  The shipment included approximately 37 Cisco ASA-series firewall units, multiple Cisco 6509-E and Cisco 7613/7609/7606-S series chassis, and 150 Cisco WS-C2960X-24TS-L switches. According to Cisco's Public Export Product Data tool, the Cisco ASA-series firewalls were controlled on the Commerce Control List under ECCN 5A002.a.1.

b.    On November 6, 2014, GHOMI wrote to an employee of UAE Freight Forwarder-1, regarding a 954-kilogram air shipment of computer network switches and modules from the UAE to Shiraz, Iran, discussed above.  GHOMI provided the following instructions to UAE Freight Forwarder-1:

76

DON'T SEND ANY INVOICE WITH THE SHIPMENT TO MAHAN.  I DON'T WANT ANY INOVICE FLOATING AROUND IN CUSTOM.  WE WILL CREATE OUR OWN INVOICE ONCE HAS BEEN RECEIVED TO CLEAR THE GOOD.  THANKS, JIMMY

119. GHOMI instructed UAE freight forwarders to conceal Cisco equipment in shipments to Iran.  For example:

a.  On November 16, 2017, GHOMI emailed UAE Freight Forwarder-2 to confirm packing arrangements for a shipment to FPR in Iran:

All looks ok except **these items to be packed hidden as well and not exposed**. 2960X-STACK. 20 PCS. In master box. EHWIC-1GE-SFP-CU. 20 PCs In master box. WS-C3850-24S-E. 10 pcs. C4KX-PWR-715 AC 20 pcs to be in master box. Above 3 items that is noted master box are small items and must be inside of bigger cartons.

(emphasis added).  Later the same day, the employee of UAE Freight Forwarder-2 confirmed: "Below items are also packed as hidden and not exposed."

b.  On March 12, 2018, GHOMI instructed UAE Freight Forwarder-2 via email to conceal pallets of Cisco networking equipment in a shipment of structured cabling from the UAE to Iran:

PLEASE ARRANGE TO GET 3 CONTAINERS TO START LOADING ALL 3 CONTAINERS OF NEXANS INCLUDING THE ONE CONTAINER YOU COLLECTED BEFORE WHICH ARE CABLE. **IN NEXANS CONTAINER IN MIDDLE OF CONTAINERS I NEED YOU TO PUT THESE CISCO SHIPMENTS**. 1. 6 pkgs from TE Link AS FOLLOW: C6807-XL-S6T-BUN Q=6 1. 2 plts from TE Link AS FOLLOW ONLY : ( THERE ARE OTHER ITEMS WHICH WILL STAY AND WE WILL SHIP LATER ) ISR4321/K9 Q=1 ISR4331/K9 Q=5 ISR4351/K9 Q=4 FROM HONG KONG SHIPMENT ONE PALLET ONLY : ( THERE ARE OTHER ITEMS WHICH WILL STAY AND WE WILL SHIP LATER ) WS-C3850-48T-E Q=5 WS-X45-SUP8L-E Q=4  **I NEED YOU TO PUT THESE IN PALLETS SAME HEIGHT AS OTHER NEXANS PALLETS AND TO PUT THE THESE IN CENTER OF PALLETS AND THEN TO USE NEXANS SMALL BOXES TO SURROUND**

77

**THESE BOXES ALL AROUND AND TOP SO ONCE YOU LOOK AT THE PALLETS IT LOOKS LIKE NEXANS PALLETS.**

(emphasis added).

120. GHOMI sought to conceal his role in shipping U.S.-origin Cisco networking equipment from Hong Kong to the UAE from U.S. financial services providers, and directed his Hong Kong supplier to under-invoice the goods to evade customs duties:

        a.    On October 23, 2017, GHOMI received an email from a Cisco reseller in Hong Kong ("Foreign Reseller-3"), which stated, "We have sent the invoice of 29 units of Cisco DS-SFP-FC16G-SW by paypal to you.  Please inform us your courier account.  Then we can send 30 units to you on Monday.  Thanks!" The Cisco DS-SFP-FC16G-SW transceivers, which were designed to provide fiber channel connectivity, were subject to the EAR and classified as EAR99.

        b.    On October 26, 2017, GHOMI replied to Foreign Reseller-3 regarding the purchase of 30 Cisco transceivers (model no. DS-SFP-FC16G-SW), stating that he would "pay for shipping for courier service to Dubai."  GHOMI requested that Foreign Reseller-3 agree to "under invoice in shipping docs for $10 each as network adapter for total of $300 to minimize custom fee."

        c.    On November 20, 2017, GHOMI, wrote to Foreign Reseller-3: "Hello, I got your invoice now and I will pay with my USA address..  It will show on paypal payment the shipping address as my USA.  then I will email you to ship to Dubai address.  you will agree with this?"

78

121. GHOMI and Co-Conspirator-6 used coded language to describe their procurement efforts for companies in Iran, including by referring to Iran as "Motherland."  For example:

a.    On July 19, 2016, Co-Conspirator-6 sent GHOMI an email with the subject line, "Requirement from Motherland !!," writing that Co-Conspirator-6 had received a request from an IT company in Tehran, Iran, for eight units of a Cisco network adapter (part no. CVR-QSFP-SFP10G) "with landed price in Tehra[n], Iran."  Co-Conspirator-6 asked GHOMI, "Please advise if you have the part no. in stocks and can do a deal thru your company."  According to Cisco's Public Export Product Data tool, the network adapter was controlled under ECCN 5A991 for anti-terrorism reasons.

b.    On August 1, 2016, Co-Conspirator-6 sent a list of approximately 332 units of Cisco equipment, valued at approximately $999,025, to GHOMI.  Co-Conspirator-6 wrote: "Hello Jim, Ref. to the subject, please find below the requirement from a Local Reseller:. . . .  As per the Customer the requirement is from a reseller in motherland and OK if the products are Registered."  Later that day, GHOMI replied, "I WILL REVIEW AND LET YOU KNOW."

c.    On August 9, 2016, Co-Conspirator-6 sent a list of Juniper networking equipment required by "a reseller for Motherland" to GHOMI and asked GHOMI to "[p]lease advise if you are working on this requirement as well."  The following day, GHOMI forwarded Co-Conspirator-6's request to Co-Conspirator-2.

79

GHOMI then replied to Co-Conspirator-6, "YES, WORKING ON IT.  IT IS A TENDER."

122. GHOMI used personal email accounts and aliases, rather than FPR-affiliated email accounts or his legal name, for the U.S.-origin procurement, payment, and shipping side of the operation.

123. GHOMI also took steps to remove his name from procurement transactions with U.S. suppliers.  As set forth above, in May 2023, GHOMI personally negotiated a transaction with U.S. Company-2, a U.S. wholesaler in Plymouth, Minnesota, for the purchase of 20 Cisco WS-C3850-24XS series networking switches.  GHOMI introduced Co-Conspirator-6, who was then replaced by Co-Conspirator-5 later in May 2023.  From May 2023, Co-Conspirator-5's UAE company, MBE Trading, procured Cisco equipment from U.S. Company-2 for shipment to Dubai, UAE, which MBE Trading then reshipped to FPR in Iran.

### 2.    GHOMI Received U.S. Export-Control Warnings

124. Over the course of the scheme, Co-Conspirator-6 sent GHOMI product license keys containing the export control warning.

a.    On October 9, 2016, Co-Conspirator-6 sent GHOMI five files containing license keys for Juniper Network equipment, stating: "Please find attached the RTU License for the Juniper Orders."  Each file contained the following language:

> [T]he license key and software that it activates are subject to US Export Administration Regulations (EAR) and other export control laws and regulations, and

80

export, re-export or other diversion contrary to any such laws and regulations is prohibited.

GHOMI forwarded the five files containing the license keys to Co-Conspirator-2.

b.    Over the course of the scheme, Co-Conspirator-6 sent GHOMI more than a dozen additional Juniper license keys, each containing the same export-control language.  In April 2018 alone, GHOMI emailed Co-Conspirator-2 more than ten such license-key files, each bearing the same warning that the license key and software were "subject to US Export Administration Regulations" and that "export, re-export or other diversion contrary to any such laws and regulations is prohibited."

c.    The U.S.-origin networking equipment GHOMI sourced for FPR included Cisco-controlled software requiring a Cisco "U.S. Export Restriction Compliance License."  For example, on September 23, 2018, Co-Conspirator-2 sent AEOI a proforma invoice on FPR letterhead that included, as a discrete itemized line, a "CISCO U.S. Export Restriction Compliance License" -- Cisco part FL-4330-HSEC-K9 -- for installation by FPR on two Cisco ISR4331/K9 routers.

125. As described above, the shipping labels for FedEx shipments GHOMI sent to Co-Conspirator-6 in the UAE contained export control warnings.  For example, on November 4, 2019, GHOMI sent a FedEx shipment described as containing a "REFURBISHED NETWORK MODULE" to Co-Conspirator-6 in the UAE. The shipping label contained the following warning:

81

These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user herein identified.  They may not be resold, transferred, or otherwise disposed of to any other country or to any person other than the authorized ultimate consignee or end-user(s) . . . without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.

### 3.    GHOMI Received Express Sanctions Warnings

126. On February 28, 2016, GHOMI sent Co-Conspirator-1 a bill of lading for a shipment containing "COMPUTER PARTS" weighing 27,810 kilograms from Jebel Ali, UAE, to Bandar Abbas, Iran.  The shipper was Ambrosia General Trading and the consignee was FPR in Tehran, Iran. The bill of lading included the following warning:

The Merchant acknowledges that the vessel is employed in the Iranian trade and so the insurance coverage for this trade may not be available due to the wide ranging Iranian sanctions.  In this respect, the Merchant unconditionally accepts that the shipment is at the Merchant's risk . . . The Merchant warrants that the cargoes being carried inside the Merchant's containers do not or are not in breach of the any sanction against Iran imposed by the US/UN/EU currently in force.

127. On April 21, 2016, GHOMI sent Co-Conspirator-1 a bill of lading for another shipment containing "COMPUTER PARTS" weighing 3,095 kilograms from Jebel Ali, UAE, to Bandar Abbas, Iran. The shipper was Ambrosia General Trading and the consignee was FPR in Tehran, Iran.  The bill of lading included the same warning described in the paragraph above.

82

128. Other bills of lading for shipments from the UAE to FPR Iran included similar warnings relating to the wide-ranging sanctions on Iran.

**H.    GHOMI Frequently Travels to Iran and the UAE**

129. GHOMI regularly traveled abroad for extended periods, including at least 11 times between March 2014 and May 2026. According to DHS records, GHOMI often traveled to, or returned from, Istanbul, Türkiye ("IST"), Doha, Qatar ("DOH"), or Abu Dhabi, UAE ("AUH"), as shown in the table below:

| Departure Date | From | To | Return Date | Return From | | Return To |
|---|---|---|---|---|---|---|
| 03/04/2014 | LAX | IST | 05/05/2014 | IST | | LAX |
| 07/07/2014 | LAX | IST | 10/04/2014 | IST | | LAX |
| 01/24/2015 | LAX | IST | 03/25/2015 | IST | | LAX |
| 06/15/2015 | LAX | IST | 08/08/2015 | IST | | LAX |
| 02/16/2016 | LAX | IST | 07/24/2016 | IKA | | LAX |
| 01/18/2017 | LAX | IST | 11/19/2017 | AUH | | LAX |
| 01/07/2018 | LAX | AUH | 03/17/2018 | DOH | | LAX |
| 09/23/2018 | LAX | DOH | 02/10/2019 | IST | | LAX |
| 06/24/2019 | LAX | IST | 03/16/2020 | DOH | | LAX |
| 11/22/2021 | LAX | DOH | 11/19/2022 | DOH | | LAX |
| 11/14/2023 | LAX | DOH | 05/05/2026 | IST | | LAX |

130. Email records show that GHOMI traveled onward to Tehran, Iran, on his international trips.  For example, GHOMI traveled from LAX to AUH on January 7, 2018, and then continued on to Tehran, Iran, on a separate flight departing AUH on January 9, 2018.

83

131. Based on my training and experience, I know IST, AUH, and DOH are commonly used transit points for travel to and from Iran.

**I.    OFAC License History Search**

132. On March 26, 2025, OFAC certified that a license history check disclosed no responsive records of applications submitted by or on behalf of, and no OFAC licenses issued to, GHOMI, FPR, Flexinet, MBE Trading, Co-Conspirator-1, Co-Conspirator-6, or Co-Conspirator-5.

**J.    BIS License History Search**

133. On April 23, 2025, BIS completed a license history check using BIS databases.  The search disclosed no responsive records of applications submitted by or on behalf of, and no BIS licenses issued to, GHOMI, FPR, Flexinet, MBE Trading, Co-Conspirator-1, Co-Conspirator-6, or Co-Conspirator-5.

**K.    GHOMI's Use of the Subject Premises**

134. GHOMI owns and resides part time at the SUBJECT PREMISES, an approximately 15,000 square foot mansion located within Crystal Cove, a private gated community in Newport Coast. The SUBJECT PREMISES has seven bedrooms, twelve bathrooms, a grand entry foyer, formal and informal living spaces, wood clad library, chef's kitchen, formal dining room, multiple wine cellars, cinematic theater, gym, and an exterior dining pavilion.

135. Based on my review of California Department of Motor Vehicles ("DMV") records, the address listed on GHOMI's driver's license is the SUBJECT PREMISES.  DMV records show the driver's

84

license was issued on November 22, 2025, and expires on January 28, 2031.

136. On May 3, 2026, law enforcement officers learned that GHOMI was arriving at LAX from Istanbul, Türkiye, on May 5, 2026.  Upon GHOMI's arrival, law enforcement officers conducting surveillance saw GHOMI depart from LAX. Shortly thereafter, law enforcement officers observed GHOMI arrive at the SUBJECT PREMISES.  Based on my training and experience, it is common for individuals to return to their homes after travel.

137. On the morning of May 8, 2026, between approximately 8:30 a.m. and 11:45 a.m., law enforcement officers conducting physical surveillance of the SUBJECT PREMISES did not observe GHOMI leave the residence. On the morning of May 11, 2026, between approximately 9:00 a.m. and 10:45 a.m., law enforcement officers conducting physical surveillance of the SUBJECT PREMISES did not observe GHOMI leave the residence.  On the morning of May 12, 2026, law enforcement officers conducting physical surveillance of the SUBJECT PREMISES saw GHOMI drive away from the residence in a dark blue Mercedes at approximately 8:55 a.m.  Based on the May 5, 2026, observation of GHOMI's arrival at the SUBJECT PREMISES from LAX, and the absence of any subsequent observation of GHOMI departing the SUBJECT PREMISES until the morning of May 12, 2026, at 8:55 a.m., I believe that GHOMI is operating his business inside the SUBJECT PREMISES.

138. Based on my review of records obtained during this investigation, FPR maintains no physical office or other commercial location in the United States, and GHOMI conducts

85

FPR's United States-side activities from the SUBJECT PREMISES. Specifically, I have reviewed bank and financial records for accounts in GHOMI's name covering November 2011 through February 2026 and have identified no payments for the rental, lease, mortgage, or utilities of any commercial or office premises. GHOMI's United States individual income tax returns for tax years 2011 through 2024 do not report any United States-source business income or expenses attributable to FPR or identify any foreign accounts owned by GHOMI.  My review of seized emails and other documents did not identify any communications referring to an FPR office or other facility located in the United States.

139. Based on my review of records produced by Apple pursuant to a search warrant for GHOMI's iCloud account, I identified photographs depicting a home office at the SUBJECT PREMISES, including images of a desk, a computer, and a telephone.  Based on my training and experience, the depicted configuration is consistent with a workspace used for conducting business correspondence and electronic communications.

140. The same iCloud records contained a photograph, dated July 16, 2019, showing GHOMI's desk at the SUBJECT PREMISES.  As depicted in the photograph below, the desk had a notepad bearing FPR's name and letterhead, as well as what appears to be a Persian daily calendar.



141. Records obtained from FedEx show that, prior to GHOMI's May 5, 2026 return to the United States, GHOMI received hundreds of computer-networking equipment orders from United States vendors at SUBJECT PREMISES.  For example:

a.    On September 12, 2015, GHOMI caused an eBay vendor to ship a Cisco WS-X6748-GE-TX 48 Port 10/100/1000 Gigabit WS-F6700-CFC to GHOMI at the SUBJECT PREMISES. GHOMI made the following request, "HELLO ,COULD YOU SEE BETWEEN FED-EX HOME AND GROUND WHICH ONE IS FASTER AND TO SHIP THE FASTER ONE. I WOULD APPRECIATE IF YOU CAN SHIP MONDAY.THANKS,JIMMY."

b.    On November 21, 2017, GHOMI caused a vendor to ship a Cisco DS-SFP-FC16G-SW 16GB SFP TRANSCEIVER to GHOMI at

87

the SUBJECT PREMISES. GHOMI made the following request, "Thank you for shipping 2nd day FED-EX. Jimmy."

      c.   On or about May 9, 2018, GHOMI caused a vendor to ship a Cisco 16 Gbps Fibre Channel Transceiver Module SW SFP+, LC, DS-SFP-FC16G-SW to GHOMI at the SUBJECT PREMISES.

      d.   Based on my training and experience, the receipt of computer-networking equipment designed for operating large server networks at a residence indicates that the homeowner is using the residence for business purposes.

142. Records obtained pursuant to court-authorized pen register and trap-and-trace orders show that during the period from April 22, 2026 through May 4, 2026, a Google email account subscribed to GHOMI was actively used to send and receive electronic mail. The connections to GHOMI's Google email account during this period originated from internet-protocol addresses sourced in France and Germany.

143. Beginning on May 8, 2026, the same Google email account subscribed to GHOMI was actively used to send and receive electronic mail. The connections to GHOMI's Google email account during the period originated from internet protocol addresses registered to a Cox Communications LLC, in Orange County.  I know from prior review of records that GHOMI was the subscriber associated with a subscriber account registered to Cox Communications LLC and associated with the SUBJECT PREMISES.

144. Pen register and trap-and-trace records also show that during the period preceding GHOMI's May 5, 2026, return to the United States -- while GHOMI was located abroad -- GHOMI was in

88

frequent communication, through the WhatsApp messaging application, with Co-Conspirator-5 and Co-Conspirator-2.  In addition, GHOMI has communicated with Co-Conspirator-1 and Co-Conspirator-5 since arriving back in the United States, including while at the SUBJECT PREMISES.

a.   From April 24, 2026 through May 4, 2026, Co-Conspirator-5 and GHOMI communicated via WhatsApp approximately 100 times.  The WhatsApp communications included messages and calls, some of which were longer than 30 minutes.  Since arriving back in the United States and at the SUBJECT PREMISES, GHOMI has continued to receive WhatsApp communications from Co-Conspirator-5.

b.   During the period preceding GHOMI's May 5, 2026, return to the United States -- while GHOMI was located abroad -- GHOMI was also in regular communication, through the WhatsApp messaging application, with Co-Conspirator-2.

c.   Since arriving back in the United States on May 5, 2026, GHOMI has been in communication through the WhatsApp messaging application with Co-Conspirator-1, who used a telephone number ending in 0072.  As recently as May 11, 2026, Co-Conspirator-1 and GHOMI communicated via a WhatsApp call.

145. Based on the foregoing and my training and experience, I believe that GHOMI uses cellular telephones, computers, and other electronic devices located inside the SUBJECT PREMISES to operate FPR's business, including by (a) procuring computer-networking equipment from United States vendors, and (b) communicating with FPR personnel and UAE intermediaries,

89

including Co-Conspirator-5, regarding FPR's business operations. Accordingly, I believe that records and instrumentalities of those activities are likely to be found inside the SUBJECT PREMISES.

* * *

146. As set forth in Attachment B, law enforcement officers are seeking to seize evidence of violations of the Subject Offenses from October 23, 1997, to the date of the proposed warrant.  Based on my training and experience, I know that international schemes involving multiple conspirators, like the scheme described above, require meaningful preparation and development of trust and relationships among co-conspirators. Moreover, due to the nature of the sanctions-evasion scheme and GHOMI's encrypted messaging communications with co-conspirators since returning to the United States earlier this month, I believe GHOMI is continuing to commit the Subject Offenses. Based on my training and experience, I also believe records through the present will be relevant to show other executions of the same scheme, steps taken to conceal past activities or avoid detection by law enforcement, reactions to the success or failure of the scheme, and other steps taken in furtherance of the Subject Offenses.

## VI.    TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES

147. Based on my training and experience investigating violations of the Subject Offenses, I know the following:

148. It is common practice for individuals involved in sanctions evasion schemes to possess and use multiple digital

90

devices at the same time.  Individuals engaged in the Subject Offenses often use digital devices to perpetrate their crimes due to the relative anonymity gained by communicating and conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) planning their schemes; (2) communicating about promised, ongoing, completed, or attempted activity or travel; (3) payment or other consideration for participation in the scheme; (4) communicating about efforts to conceal the scheme; (5) reacting to the success or failure of the scheme; and (6) coordinating meetings and other communications with co-conspirators.  Digital devices used for export and foreign agent schemes may be backed up to online services, and documents, communications, location data, and activity information from digital devices are frequently backed up to online services.  These backups then can be reflected on different digital devices found inside the SUBJECT PREMISES and on GHOMI's person.

149. Based on my training and experience, I know that individuals engaged in the Subject Offenses often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators to conduct their scheme. Oftentimes, they do so on their digital devices and online accounts.  Conspirators often use their digital devices to communicate with co-conspirators by phone, data text, SMS text, email, and social media, including sending photos. These communications, photos, and their drafts may be saved to cloud

91

services and on digital devices found inside the SUBJECT PREMISES and on GHOMI's person.

150. Based on my training and experience, I know that key evidence of the Subject Offenses may include messages commonly sent to a subject's personal email accounts.  This evidence may include banking information; information about social media accounts used; information about encrypted messaging applications used; information about motive to commit the Subject Offenses, like debts, ideological beliefs, or reactions to foreign events; and information about a subject's domestic and international travel.  In this case, those communications, screenshots of communications, draft communications, and attachments may be synched to online services and found on devices inside the SUBJECT PREMISES and on GHOMI's person.

151. Based on my training and experience, I also know that individuals who own cellphones often sync, backup, or copy the communications and data on those cellphones to other electronic devices such as laptop computers, desktop computers, other cellphones, and other electronic storage devices.  Those communications and data can be synced for a number of reasons, including to allow the user to continue the same conversation on multiple devices or to safely store/backup in case messages are inadvertently deleted on one device.  The synced communications and data could include text messages, photos, call history, and other electronic information.  In many instances, I have seen individuals engaged in criminal activity create, send, and receive screenshots of key email or text message communications.

92

They may also write draft text messages or emails in the popular Apple Notes application.

152. Accordingly, communications made and data recorded using one electronic device could be automatically or manually synced on another electronic device.  These materials can also be easily moved between an individual's electronic devices and storage accounts, such as by email and file sharing and transfers between devices and accounts.  Devices are often synced to each other using online services.

153. Records related to the identities and roles of co-conspirators or aiders and abettors to the Subject Offenses, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when electronics were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise.

154. Many of the records described above can be kept digitally (like on a phone or drive) or in hardcopy form. Both types of records are often found in a home.  Some records are especially likely to be found in a home, like the SUBJECT PREMISES, such as travel records, receipts, ledgers, prior digital devices (like a cellphone no longer in use but still containing communications from the relevant period).  Some individuals who commit the Subject Offenses may keep immediate

93

communications on their phone or digital devices, but historical information about their crimes in a ledger, folder, filing cabinet, or other hardcopy record that may be found in a home. Based on my training and experience, even those people involved in the Subject Offenses who might try to delete or destroy incriminating records might still keep relevant records in their home. These could be seemingly non-criminal records, like travel information and records of ideology or motivation, but those records may still be relevant to the Subject Offenses.

155. Furthermore, as set forth above, I believe GHOMI spends part of his time in the United States and part of his time in Iran. Indeed, in recent years, GHOMI has spent substantial time abroad. GHOMI departed the United States in June 2019 and did not return until March 2020, an absence of approximately nine months; he again left the United States in November 2021 and did not return until November 2022, an absence of approximately one year; and he again left the United States in November 2023 and did not return to the United States until May 2026, an absence of approximately two and one-half years. I believe the SUBJECT PREMISES is still likely to contain evidence and instrumentalities of the Subject Offenses, for the following reasons:

a. As set forth above, GHOMI maintained business records related to FPR at the SUBJECT PREMISES. In addition, based on pen register data, since his return to the United States from Iran on May 5, 2026, GHOMI has communicated with co-

94

conspirators using WhatsApp, including from the SUBJECT PREMISES.

b.    Based on my training and experience, individuals who keep multiple homes often keep devices in each of those locations, which are synced together using online services or contain historical records.  Individuals such as GHOMI keep devices in multiple locations for convenience's sake, to avoid crossing international borders with their devices, and because those devices may be used in different parts of the scheme. Individuals involved in criminal schemes often use different devices to communicate with different co-conspirators.

c.    Based on my training and experience, I know that records kept in a home may be different from those records found on a person.  Individuals tend to keep longer-term storage in homes they only use occasionally, but that can include evidence of the Subject Offenses like ledgers, contact information, business cards, travel information, visa and other immigration applications, business filings, licensing documents, passports, books or how-to guides for compliance with sanctions and export laws, records of bank accounts and online accounts used, physical correspondence, and digital devices no longer in active use.

d.    Finally, based on my training and experience, I believe GHOMI may keep evidence and records at his home in Newport Coast that he does not want to be discovered by the Government of Iran.  GHOMI may also keep bulk proceeds in the

SUBJECT PREMISES that he wants to protect from seizure or search by the Government of Iran.

### VII.  TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES

156. Based on my experience, training, and familiarity with cellphones, I am aware of the following:

a.   Cellphones frequently have telephone directory features, as well as methods to learn the call number associated with each cellphone, such as caller-identification features. Cellphones also typically contain records of recent call activity, both incoming and outgoing calls, and lists of stored telephone numbers and other identifying information, such as names. Cellphone users often maintain lists, such as address books or contact information, that are stored on the cellphone or its SIM or memory card.

b.   Cellphones typically have voicemail or voice-mailbox features that allow callers to leave voice and/or alphanumeric messages if the cellphone user does not answer. Voicemail is typically stored on the computer network of the provider of the cellphone's telephone service, which network is external to the cellphone, but may also be stored on the cellphone itself.

c.   Cellphones typically have messaging capabilities, including text, data, chat, digital photographs and video, MMS (i.e., multimedia messaging service), and SMS (i.e., short message service) messaging and email (collectively, "text messages"), that permit the cellphone's user to send and receive text messages, including messages with digital photographs and

96

video attached. Text messages and any attachments are typically stored on the computer network of the provider of the cellphone's telephone service, which network is external to the cellphone, but may also be stored on the cellphone itself.

d.    Cellphones often have electronic calendar features that allow the cellphone user to schedule appointments and meetings. Cellphones users often use that feature to remind themselves of meetings and appointments with friends and confederates.

e.    In addition to voicemail and text-messaging features, cellphones typically offer capabilities such as sending and receiving email, and accessing and downloading information from the Internet.

f.    Cellphones may have applications installed, including social media and messaging applications that permit the user to communicate with contacts using these applications.

g.    Cellphones with camera functions permit the cellphone user to take photographs and videos, which are stored on the cellphone itself.

h.    Cellphones may record location data that records where the user has carried or used the cellphone.

i.    The information described above usually remains accessible in the cellphone's memory even if the cellphone has lost all battery power and has not been used for an extended period of time.

157. Based on my training and experience, I also know that, where electronic devices such as the Subject Device are used in

97

furtherance of criminal activity, evidence of the criminal activity can often be found months or years after the criminal activity occurred. This is typically true because:

a. Electronic files can be stored on an electronic device for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

b. Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on an electronic device, the data contained in the file does not actually disappear, but instead may remain on the device, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the device. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve data from an electronic device depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

c. If a user changes electronic devices, like a cellphone, the user will typically transfer files from the old device to the new device, so as not to lose data.

158. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

98

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

159. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000

100

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

160. The proposed search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GHOMI's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of GHOMI's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

### VIII.   CONCLUSION

161. For all of the reasons described above, I submit that there is probable cause to believe that GHOMI has committed a violation of 50 U.S.C. § 1705 (a), (c) (Conspiracy to Violate the International Emergency Economic Powers Act).

162. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT PREMISES and on GHOMI's person.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __2nd__ day of June, 2026.

_____
THE HON. DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

102